UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTHER GRACE SIMMONS,<br>7251 Skidaway Road<br>Savannah, GA  31406,<br><br>    Plaintiff,<br><br>            v.<br><br>CHRISTOPHER COX,<br>as and in his capacity as<br>CHAIRMAN OF THE<br>SECURITIES & EXCHANGE COMMISSION,<br>450 Fifth Street, N.W.<br>Washington, D.C. 20549,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) <u>JURY TRIAL DEMANDED</u> |

**<u>VERIFIED COMPLAINT</u>**
(Race and Gender Discrimination and Reprisal)

A.  <u>JURISDICTION AND VENUE</u>

1. The Court has jurisdiction over this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e-5(f) and 16(c), 5 U.S.C. § 703, and 28 U.S.C. §1331.

2. Venue properly lies within this Court because the cause of action arose in the District of Columbia.  See 42 U.S.C. §2000e-5(f)(3); 28 U.S.C. §1391(e).

B.  <u>THE PARTIES</u>

3. Plaintiff Esther Grace Simmons (hereinafter "Plaintiff") is a former employee of the Securities and Exchange Commission (SEC) and a resident of Georgia.  During the course of her employment at the SEC, she resided in the District of Columbia.

4. Christopher Cox is, and is sued in his official capacity of, Chairman of the Securities and Exchange Commission (hereinafter "the Agency").

### C. THE FACTS CENTRAL TO PLAINTIFF'S CLAIMS

5. Plaintiff is an African-American woman.

6. On December 4, 1988, Plaintiff began her employment with the Agency as a Clerk-Typist, GS-4.

7. At the time Plaintiff began her employment with SEC, she had a Bachelor of Arts degree and a paralegal certificate.

8. From 1988 to 1990, Plaintiff's supervisors gave her "outstanding" ratings on her performance appraisals, and in 1990 the Agency promoted her to Secretary, GS-5, in the Division of Market Regulation.

9. In the early 1990's, Plaintiff continued to receive "outstanding" ratings on her performance appraisals and the Agency promoted her to Secretary, GS-6, in the Division of Market Regulation.

10. Around this time, Plaintiff attended a two-week Broker Dealer Training Course and successfully passed the Broker Dealer examination with the highest score of any of the support staff in the training.

11. Thereafter, the Agency promoted Plaintiff from Secretary to GS-7 Securities Compliance Technician in the Office of Compliance Inspections and Examinations ("OCIE").

12. In 1997, Plaintiff's supervisor, Glen Barrentine, again gave her high praise for her work, in a letter of recommendation and an "outstanding" rating on her performance appraisal.

13. While working for the Agency, Plaintiff continued pursuing her education, and in 1996 she earned a Master of Arts degree from Howard University in Human Communication Studies.

14. On August 25, 2000, Plaintiff received even more praise for her work as a

Securities Compliance Technician in a performance appraisal from her supervisor, OCIE Assistant Director Helene McGee. Ms. McGee gave her an "Exceeds Fully Successful" rating in three accomplishment areas and an "Outstanding" rating in the other two accomplishment areas. As a result, Plaintiff received a performance award of $500.

15. In September 2000, based on Plaintiff's outstanding performance, the Agency promoted her again, to Paralegal Specialist, GS-0950-09, in the Division of Corporation Finance.

16. As a paralegal specialist, Plaintiff responded to Freedom of Information Act requests and Confidential Treatment Requests.

17. When Plaintiff was promoted to a Paralegal Specialist for the Division of Corporation Finance, Herbert D. Scholl, Office Chief, became her supervisor.

18. Until this time, in the 12 years Plaintiff had worked for the Agency, she had received only positive feedback and "outstanding" ratings from her supervisors, as well as frequent bonuses.

19. Mr. Scholl is a Caucasian male.

20. When Plaintiff began working under Mr. Scholl, Jacob Fien-Helfman, the Information Officer, trained her in processing Confidential Treatment Requests and Richard Landy, the FOIA Specialist, trained her in processing Freedom of Information Act requests. Initially, Mr. Fien-Helfman and Mr. Landy reviewed Plaintiff's work.

21. On June 22, 2001, Mr. Scholl gave Plaintiff her first performance appraisal as a Paralegal Specialist, GS-9, for the period of August 28, 2000, through April 30, 2001. In that appraisal, Mr. Scholl gave her a "pass" performance rating in all six of the critical elements on which she was evaluated. Under this performance rating system, employees either received a "pass" or a "fail," instead of the previously-used ratings of "does not meet," "meets," or

"exceeds expectations."

22. On August 26, 2001, the Agency gave Plaintiff a within-grade step increase from GS-9/3 to GS-9/4.

23. Between August 28, 2000, and April 30, 2002, Plaintiff's work performance did not change, but her performance ratings did.

24. In July 2002, Mr. Scholl gave Plaintiff a Performance Appraisal for May 1, 2001, through April 30, 2002, with a "fail" rating on three critical elements and a "pass" rating on the other three critical elements. Because she was rated as failing in three critical elements, Plaintiff did not receive a pay increase and was ineligible for the Agency's Student Loan Repayment program, whereby she could be reimbursed for some of the money she spent in obtaining her Master of Arts degree.

25. Upon information and belief, Mr. Scholl gave Plaintiff failing ratings because in February 2002, Plaintiff informed Mr. Scholl of an error that he had made with regard to a Confidential Treatment request. Mr. Scholl had not taken the criticism well and at that point he began scrutinizing Plaintiff's work hypercritically and verbally abusing her in front of other employees in the office.

26. Upon information and belief, Mr. Scholl had no difficulties accepting criticism from his Caucasian employees, both male and female, or his African-American male employees, but he could not accept criticism from African-American females.

27. For example, Brenda Nesbitt, another African-American female who worked under Mr. Scholl's supervision until the late 1990's, challenged and voiced criticism of Mr. Scholl. Mr. Scholl eventually transferred her out of his department. The Agency fired her shortly thereafter.

28.    Irene Poyser, another African-American female who worked under Mr. Scholl's supervision with Plaintiff, also challenged and voiced criticism of Mr. Scholl. As with Plaintiff (see below), Mr. Scholl remained her supervisor when all other employees in her position were being switched to another supervisor, Mr. Scholl refused to transfer her when she requested it, and he verbally abused her in front of other employees on a regular basis. Ms. Poyser complained about this inequitable treatment to Alan Beller, Director of the Division of Corporation Finance, but Mr. Beller rejected her complaint. Mr. Scholl eventually engineered her removal from the Agency.

29.    Because Plaintiff did not agree with the July 2002 appraisal at all and believed that Mr. Scholl was treating her differently, on August 7, 2002, she submitted a detailed Rebuttal of Performance Appraisal and asked Shelley E. Parratt, Principal Associate Director, to reconsider her ratings.

30.    Around this time, Plaintiff also informed Mr. Scholl that his actions constituted disparate treatment and advised him that she would be fighting this treatment in court.

31.    On August 23, 2002, James M. Daly, Associate Director of the Division of Corporation Finance, denied her request for reconsideration of her July 2002 ratings.

32.    On August 28, 2002, Plaintiff filed a grievance with her union, the National Treasury Employees Union (NTEU), regarding the appraisal.

33.    Between July 2002 and October 1, 2002, Plaintiff did not receive any further documents from Mr. Scholl regarding her performance.

34.    On October 1, 2002, Mr. Scholl gave her a Notice of Opportunity to Improve Performance. In it, Mr. Scholl informed Plaintiff that he was placing her on a Performance Improvement Plan ("PIP") and giving her 90 days to improve her performance level in the three

critical elements in which he gave her "fail" ratings on her July 2002 Performance Appraisal. He also informed Plaintiff that he would be meeting with her regularly to discuss her performance and that he and he alone would be reviewing her work.

35. Thereafter, Plaintiff advised Mr. Scholl again of his inequitable treatment of her.

36. On November 18, 2002, Plaintiff's union and the Agency agreed to resubmit her grievance, which was at Stage One, to Mr. Daly for reconsideration.

37. On December 4, 2002, Mr. Scholl called Plaintiff into his office and told her that he had no intention of giving her a "pass" rating on her PIP, even though Plaintiff had been on the PIP for only 60 of its 90 days. He stated that he had spoken with her Freedom of Information Act ("FOIA") and confidential treatment requests reviewers, and they had agreed she should not receive a pass rating, even though both reviewers had given her positive feedback on her work. Then Mr. Scholl stated that the Agency union representative, Gerald Werner, agreed that Plaintiff should be demoted to a secretary, GS-6, and told her he could get her a position as his secretary. (Mr. Werner later told Plaintiff that this statement was untrue.) Mr. Scholl claimed that no other office would take her as a secretary, despite the fact that she had received extremely positive performance appraisals as a secretary for twelve years before she became a paralegal specialist. He went on to assert that if Plaintiff didn't accept this demotion and become his secretary, he would fire her immediately. Plaintiff complained again to Mr. Scholl about his disparate treatment of her.

38. The PIP and threats were unwarranted because Plaintiff's work performance still had not declined from June 2001, when she received a "pass" rating on her performance appraisal from Mr. Scholl. However, Plaintiff knew Mr. Scholl was capable of carrying out his threats, because he had even gone so far as to tell another supervisor, whom she had approached

about a possible transfer, that she couldn't do the work of a paralegal specialist, thereby impeding any transfer she might seek.

39. On December 18, 2002, Plaintiff's union resubmitted her grievance to Mr. Daly for consideration, as agreed, and on January 8, 2003, Mr. Daly denied the grievance.

40. On March 28, 2003, Mr. Daly sent Plaintiff a Notice of Proposed Reduction in Grade for Unsuccessful Performance. In the notice, Mr. Daly informed her that because of her allegedly unsuccessful performance on her PIP, the Agency was proposing her demotion from a Paralegal Specialist, SK-9, to a Paralegal Specialist, SK-7.

41. On April 3, 2003, in response to this notice, Plaintiff wrote a letter to Mr. Daly, Mr. Beller, and Jayne Seidman, Associate Executive Director, Office of Administrative and Personnel Management, refuting Mr. Scholl's allegations of unsuccessful performance and attaching supporting documents.

42. On June 9, 2003, Mr. Beller, the deciding official in the subject proposal, gave her the opportunity to respond orally to the Notice of Proposed Reduction in Grade. Plaintiff gave an oral reply in opposition to the proposal.

43. On July 18, 2003, Mr. Beller decided to reduce Plaintiff's grade to SK-7, effective July 27, 2003.

44. On July 28, 2003, because of all of the difficulties Plaintiff was having with Mr. Scholl and because her continuous complaints about his inequitable treatment had gone unnoticed, she requested reassignment to Atlanta, Georgia. However, the Agency did not reassign Plaintiff.

45. On July 28, 2003, the union invoked arbitration on her behalf to contest the demotion.

46. Plaintiff continued to work as a paralegal specialist at her same good performance level.

47. Then, on October 16, 2003, Ms. Carol Smith, Deputy Associate Director, informed Plaintiff that the Agency would delay her reduction in grade from July 27 to October 19, 2003, because of the pending arbitration proceeding.

48. On or about October 19, 2003, the reduction in grade became effective.

49. On or about October 30, 2003, Mr. Scholl gave Plaintiff a Performance Plan and Evaluation of her work as a SK-9 from May 1, 2002, to October 2, 2003. He gave her a performance rating of "acceptable."

50. However, when Plaintiff met with Mr. Scholl regarding the evaluation on October 2, 2003, Mr. Scholl said that he was "passing" her as a SK-7, not a SK-9, although she had worked as a SK-9 for almost all of the evaluation period.

51. Thereafter, Plaintiff's union proceeded to arbitrate her demotion grievance, and an arbitration hearing was held on January 6 and 7, 2004.

52. In that hearing, Katie Nix, a Senior Financial Analyst, testified that Mr. Scholl had informed her that he was going to give Plaintiff a failing evaluation in July 2002, not because he thought that she was doing failing work, but because he did not want her to receive a pay increase to SK-11, which would be automatic under the union contract if she received a passing evaluation at that time. The union introduced other evidence to support Plaintiff's grievance. Notwithstanding the evidence in Plaintiff's favor, the arbitrator denied Plaintiff's grievance on or about March 19, 2004. As a result, she remained an SK-7 paralegal specialist.

53. After the arbitration decision, Plaintiff continued doing her work well, and Mr. Scholl continued to be the exclusive reviewer of Plaintiff's work.

54. Because of Mr. Scholl's continuing hypercritical scrutiny and verbal abuse, on or about May 18, 2004, Plaintiff applied for a position as a Courtroom Clerk for the Superior Court of the District of Columbia. Plaintiff interviewed for the position twice and was rejected for the position.

55. Upon information and belief, the Superior Court of the District of Columbia intended to hire Plaintiff until Andrew Moore of the Superior Court contacted Mr. Scholl for a reference for Plaintiff, and Mr. Scholl provided Mr. Moore with such a poor inaccurate reference, indicating that Plaintiff lacked the ability to read or write, that the court decided not to hire Plaintiff.

56. Thereafter, on June 3, 2004, Mr. Scholl gave Plaintiff a Performance Plan and Evaluation for October 3, 2003, through April 30, 2004, in which he rated her performance as "unacceptable."

57. Plaintiff contacted her union about this evaluation, but the union advised her that the Agency would only deny her grievance again, so Plaintiff did not file a new grievance.

58. On June 24, 2004, Mr. Scholl gave Plaintiff another Notice of Opportunity to Improve Performance. In the notice, Mr. Scholl placed her on a 60-day PIP to improve her work performance to what he regarded as an acceptable level.

59. The 60-day PIP period ended on or about August 24, 2004, but the Agency took no adverse action against her at that time.

60. Plaintiff continued to do her work well through November 2004.

61. On November 1, 2004, based on Mr. Scholl's review of Plaintiff's work during the 60-day period of her PIP, Mr. Daly sent her a Notice of Proposed Removal for Unsuccessful Performance.

62. The notice, based entirely on the opinions of Mr. Scholl, alleged a number of instances in which Mr. Scholl thought Plaintiff's performance was unsuccessful.

63. In the notice, Mr. Scholl alleged that during her performance improvement period of June 24 to August 23, 2004, Plaintiff unsuccessfully performed her job in three critical job elements -- knowledge of field or occupation, execution of duties, and communications, and purported to provide examples of each. However, Mr. Scholl misrepresented Plaintiff's work, took it out of context, provided examples that did not support his conclusions, and provided at least one example of work which Plaintiff had done <u>before</u> her 2004 PIP.

64. Also on November 1, 2004, Mr. Scholl was made the Office Chief, and Valerie Lewis, an African-American female, became Plaintiff's supervisor.

65. Once Mr. Scholl was no longer reviewing Plaintiff's performance, for the first time in several years, she received little or no negative feedback on her work. She submitted numerous FOIA request responses to Ms. Lewis, and Ms. Lewis made few, if any, corrections on her work.

66. However, in late November, 2004, Mr. Scholl ordered Ms. Lewis to give him Plaintiff's work to review again. Upon information and belief, Mr. Scholl reviewed no other employees' work.

67. Thereafter, Mr. Scholl resumed scrutinizing Plaintiff's work hypercritically, as he had done before.

68. On or about November 23, 2004, Plaintiff submitted her opposition to the Notice of Proposed Removal to Alan Beller, Director, Division of Corporation Finance at the Agency. Plaintiff provided a lengthy and detailed affidavit, along with over 30 exhibits, to refute Mr. Scholl's claims. She also contended that Mr. Scholl's treatment of her demonstrated a pattern of

discriminatory and retaliatory conduct against her and that the removal would constitute discrimination and retaliation.

69. Plaintiff continued to work under Mr. Scholl's scrutiny from November 2004 through January 2005.

70. On or about January 28, 2005, Mr. Beller issued Plaintiff a Removal Decision for Unsuccessful Performance, removing her effective February 11, 2005. In the decision, Mr. Beller cited only nine of the thirteen instances which Mr. Scholl alleged constituted Plaintiff's Unsuccessful Performance.

71. On or about April 28, 2005, after the Agency terminated Plaintiff, Plaintiff applied to a Home Depot store in Hyattsville, Maryland, as a Night Inventory Clerk. On the application, she indicated that she had been discharged from an employer. On April 29, Plaintiff contacted Home Depot about her application and spoke with someone in the personnel office, who advised her that Home Depot was impressed with her education background and experience, but when it had contacted the Agency for a reference, the Agency reported that Plaintiff had an employment dispute with the Agency that was being investigated at this time and that for that reason, Home Depot would not hire her.

72. Upon information and belief, the personnel office of Home Depot spoke with Mr. Scholl and Mr. Scholl provided the office with a bad, false reference for Plaintiff.

73. Thereafter, Plaintiff moved to Savannah, Georgia, and consulted with Carolyn Trosdal, her financial advisor and Vice President at Wachovia Securities, and an old family friend, about her Thrift Savings Plan. When Ms. Trosdal heard that Plaintiff was unemployed, she offered to refer her to a relative of hers who manages an area Hampton Inn. Plaintiff thanked her for her offer. However, when Ms. Trosdal spoke with the Agency about Plaintiff's Thrift

Savings Plan, the Agency informed Ms. Trosdal that Plaintiff had been fired from the Agency and upon information and belief, gave Ms. Trosdal such a poor reference that she did not refer Plaintiff to her relative at the Hampton Inn for a position.

74.    Upon information and belief, Mr. Scholl continues to give Plaintiff a poor false job references.  Plaintiff has been applying for positions which range from manual laborer to office staffer, but has been unable to obtain any employment after her removal from the Agency.

D.  STATEMENT OF PLAINTIFF'S CLAIMS

Count I:  Race and Gender Discrimination
(Title VII)

75.    Plaintiff adopts and incorporates by reference paragraphs 1-74 above.

76.    Title VII makes it unlawful for an employer, including the Agency, to discriminate in employment on the basis of race or gender.  42 U.S.C. §2000e-2(a)(1).

77.    In removing Plaintiff, the Agency discriminated against her because of her race and gender.

78.    By discriminatorily removing Plaintiff, the Agency violated Title VII, 42 U.S.C. §§2000e-2(a)(1), 2000e-16(a), (e).

79.    As a result of the Agency's discrimination against her, Plaintiff has suffered and is suffering considerable injury, including loss of present and future earnings, and mental distress, embarrassment, humiliation, and indignity.

## Count II:  Retaliation for Opposing Discrimination
### (Title VII)

80. Plaintiff adopts and incorporates by reference paragraphs 1-79 above.

81. Title VII, 42 U.S.C. §2000e-3(a), prohibits employers covered thereby, including agencies of the Federal Government, from taking reprisal against an employee for complaining about practices which the employee reasonably and in good faith believes are discriminatory.

82. In opposing alleged discrimination by the Agency, as described above, Plaintiff engaged in activities protected by Title VII, 42 U.S.C. §2000e-3(a).

83. Defendant knew of these activities when Plaintiff engaged in them.

84. In removing Plaintiff, the Agency was motivated by her protected activities in opposing discrimination in employment.

85. Defendant therefore violated Title VII, 42 U.S.C. §2000e-3(a), by removing Plaintiff.

86. As a result of the defendant's retaliation against her, Plaintiff has suffered and is suffering considerable injury, including loss of present and future earnings and mental distress, embarrassment, humiliation, and indignity.

## E.  REMEDIES

87. WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting her the following relief from defendant:

a) Reinstatement to a position equivalent to her former position under 42 U.S.C. §2000e-5(g)(1);

b) Backpay under Title VII for removing her under 42 U.S.C. §2000e-5(g)(1);

    c)    Compensatory damages and punitive damages up to the amount of $300,000 under Title VII and the Civil Rights Act of 1991, 42 U.S.C. §§1981a(a)(1),(b)(1)-(2),(b)(3)(D), for maliciously and wrongfully discriminating against Plaintiff in removing her;

    d)    Prejudgment and postjudgment interest thereon, effective February 11, 2005;

    e)    Reasonable attorneys' fees and costs under Title VII, 42 U.S.C. §§2000e-5(k) and 2000e-16(e); and

    f)    Such other and further relief as to the Court deems just and warranted.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

88.    On or about February 28, 2005, Plaintiff initiated an informal EEO complaint over her removal and poor references.

89.    On or about April 6, 2005, she filed a formal administrative EEO complaint over her removal and poor references.

90.    On or about July 26, 2005 after an investigation, Plaintiff elected to have the Agency make a final decision based on that investigation, since her objective was to file her complaint in court.

91.    On or about August 12, 2005, the Agency issued a Final Agency Decision (FAD) on Plaintiff's complaint, along with a notice that she could file a complaint in court within 90 days after receipt of the FAD.

92.    Plaintiff's counsel received the FAD on or about August 15, 2005.

93.    This complaint is filed within 30 days after said receipt.

## G. JURY TRIAL DEMAND

94.    Plaintiff requests a jury trial on all issues of fact and damages arising herein.

## VERIFICATION

I hereby certify under penalty of perjury that I am the plaintiff in the above-captioned case; that I have read the foregoing Verified Complaint; and that the facts related herein are true and correct to the best of my knowledge, information, and belief.

Executed at Savannah, GA, this _____ day of September, 2005.

_____
ESTHER GRACE SIMMONS

Respectfully submitted,

_____
ALAN BANOV #95059
ab@banovlaw.com[1]
MARIA BREMIS #475822
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036
(202) 822-9699
Fax: (202) 842-9331
<u>Attorneys for Plaintiff</u>

---

[1] Registered in the Court's ECF system as legalrun@aol.com.