UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTHER GRACE SIMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05CV01828 (RCL) |
| | ) | |
| CHRISTOPHER COX, | ) | |
| as and in his capacity as | ) | |
| CHAIRMAN OF THE | ) | |
| SECURITIES & EXCHANGE COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.      STATEMENT OF FACTS

A.  Plaintiff's Education

Plaintiff is an African-American woman.  Complaint ¶5; Answer ¶5; Deposition Transcript of Esther Grace Simmons ("Simmons Depo. [Deft. Ex. 7]") 85.  In 1984 she received a Bachelor of Arts degree from Howard University.  See Complaint ¶7; Answer ¶7; Simmons Depo. [Deft. Ex. 7] 6-7, 16.  In 1987 she was admitted to Howard University School of Law.  Ex. 5 hereto. [P002].  She received a paralegal certificate in 1989.  See Complaint ¶7; Answer ¶7; Simmons Depo. [Deft. Ex. 7] 6-7, 16.  In the early 1990's, Plaintiff attended a two-week Broker Dealer Training Course and successfully passed the Broker Dealer examination with the highest score of any of the support staff in the training.  Complaint ¶10.

Plaintiff continued pursuing her education while working for the Agency, and in 1996 she earned a Master of Arts degree from Howard University in Organizational Communications. Complaint ¶13; Simmons Depo. [Deft. Ex. 7] 14-15.

### B. Plaintiff's Early Employment at the SEC

Plaintiff began her employment with the Securities and Exchange Commission ("the Agency") on December 4, 1988, as a Clerk-Typist, GS-4. Complaint ¶6; Answer ¶6; Simmons Depo. [Deft. Ex. 7] 7-8.

From 1988 to 1990, Plaintiff's supervisors gave her "Outstanding" ratings on her performance appraisals, and in 1990 the Agency promoted her to Secretary, GS-5, in the Division of Market Regulation. Complaint ¶8; Answer ¶8; Simmons Depo. [Deft. Ex. 7] 10-11; Defendant's Answers to Interrogatories, Admissions and Requests for Production of Documents ("Deft. Int. Ans. [Ex. 3 hereto] No. 2. In the early 1990's, Plaintiff continued to receive "Outstanding" ratings on her performance appraisals, and in 1992 the Agency promoted her to Secretary, GS-6, in the Division of Market Regulation. Complaint ¶9; Answer ¶9. Throughout the 1990's she received performance awards and within-grade increases. See, e.g., Exhibits 9, 15 hereto.

In or about June 1996 the Agency promoted Plaintiff from Secretary to GS-6 Securities Compliance Technician in the Office of Compliance Inspections and Examinations ("OCIE"). Complaint ¶11; Answer ¶11; Deft. Int. Ans. [Ex. 3 hereto], No. 2. Effective March 1997 the Agency promoted her to GS-7 Securities Compliance Technician. In July 1997, Plaintiff's supervisor, Glen Barrentine, again gave her high praise for her work in a letter of recommendation and an "Outstanding" rating on her performance appraisal. Complaint ¶12. See Ex. 8 hereto.

From 1996 to August 2000, Plaintiff worked as a GS-7 Securities Compliance Technician for the SEC. Plaintiff's Answers to Defendant's First Set of Discovery Requests to Plaintiff ("Pl. Int. Ans.) [Ex. 1 hereto], No. 3. In September 1997 she received another performance award.

See Ex. 9.  Her supervisor, OCIE Assistant Director Helene McGee, rated her performance as

"Exceeds Fully Successful," in September 1998, Ex. 10, and June 1999, Ex. 12, and she received

a $500 performance award in August 1999.  Id.

On August 25, 2000, Plaintiff received even more praise for her work as a Securities

Compliance Technician in a performance appraisal from Ms. McGee.  Ms. McGee gave her an

"Exceeds Fully Successful" rating in three accomplishment areas and an "Outstanding" rating in

the other two accomplishment areas.  Defendant's Responses to Plaintiff's Requests For

Admissions ("Deft. Resp. to RFA") [Ex. 7], No. 1; Ex. 13 hereto.  Also in October 2000,

Plaintiff received a performance award of $500.  Complaint ¶14; Answer ¶14.

### C.  Plaintiff's Promotion to Paralegal Specialist

In about August 2000, the Agency promoted Plaintiff again, to Paralegal Specialist, GS-

09, in the Division of Corporation Finance.[1]  Complaint ¶15; Answer ¶15; Pl. Int. Ans. [Ex. 1

hereto], No. 3; Deft. Resp. to RFA [Ex. 7], No. 2.  In hiring her, Herbert Scholl stated:  "The

above named applicant was selected because of her demonstrated analytical abilities, her

knowledge of SEC information sources, and her understanding of SEC and Division

procedures."  Ex. 44 hereto [P026].  In her previous 12 years at the Agency, Plaintiff had

received only positive feedback and "outstanding" ratings from her supervisors, as well as

frequent bonuses.  Complaint ¶18.

As an SK-9 Paralegal Specialist, Plaintiff performed time sensitive work for attorneys,

accountants, staff and the public in researching and completing Freedom of Information Act

("FOIA") requests and Confidential Treatment Requests ("CTRs").  Complaint ¶16; Deft. Int.

Ans. [Ex. 7], No. 3.  FOIA requests to the Commission are processed in a separate FOIA office

---

[1]  Later, after SEC adopted a different pay series, she became an SK-9.

outside the Division of Corporation Finance ("Corp Fin").  When the FOIA office is unable immediately to obtain the requested information that Corp Fin maintains, it sends the request to the Office of EDGAR and Information Analysis ("OEIA").[2]  OEIA then looks for the information, puts it together, and sends the information to the FOIA office for further processing. Deft. Int. Ans.  [Ex. 7 hereto], No. 3.  Plaintiff was responsible for retrieving the requested information.  She would then prepare a memorandum to be sent to the FOIA office, along with the information.  Each FOIA application is unique.  She was required to read and understand what was being asked for in each FOIA request.  Deft. Int. Ans. [Ex. 3 hereto], No. 3.  CTRs are requests to keep confidential some information in otherwise public filings.  Companies make applications to keep the information non-public.  OEIA is responsible for about 1,200 CTRs each year.  The applications are processed based on the requirements under FOIA.  A checklist is used to review each CTR.  Plaintiff was responsible for reviewing the CTR against the checklist to see whether it met the criteria for an immediate grant of confidential treatment.  If not, the CTR was brought to the reviewer's attention.  Deft. Int. Ans. [Ex. 3 hereto], No. 3.

In addition to handling FOIA requests and CTRs, Plaintiff conducted extensive computerized research utilizing LEXIS, the Name Relationship Search Index (N.R.S.I.), SEC's EDGAR system and the Filing and Computer Tracking System (FACTS).  In addition, Plaintiff worked independently to prioritize, maintain and finalize written recommendations with a vigorous workload; briefed the chief supervisor and staff on the status of FOIA assignment; assisted other staff members with special projects and assignments; and conducted analytical research.  Pl. Int. Ans. [Ex. 1 hereto], No. 3.

When Plaintiff was promoted to Paralegal Specialist for the Division of Corporation

---

[2] "EDGAR" is the acronym for SEC's Electronic Data Gathering Analysis Retrieval system.

Finance, Herbert D. Scholl, Office Chief, became her supervisor.  Complaint ¶17; Answer ¶17;
Scholl Depo. [Deft. Ex. 3] 104-105.  Mr. Scholl is a Caucasian male.  Complaint ¶19; Answer
¶19.

The Paralegal Specialist was a new position.  Deft. Ex. 8, p. 97.  Although Plaintiff
received minimal formal FOIA training from outside OEIA, her training was primarily on-the-
job.  Deft. Int. Ans. [Ex. 3 hereto], No. 4; Deft. Ex. 8, p. 97.  When Plaintiff began working
under Mr. Scholl, Jacob ("Jake") Fien-Helfman, the Information Officer, trained her in
processing CTRs and Richard Landy, the FOIA Specialist, trained her in processing FOIA
requests and served as her FOIA supervisor from August 28, 2000 to October 1, 2002.  Simmons
Depo. [Deft. Ex. 7] 92, 95; Scholl Depo. [Deft. Ex. 3] 47-51; Defendant's Supplemental
Objections and Responses to Plaintiff's First Set of Interrogatories, Requests for Admissions,
and Requests for Production of Documents ("Deft's Supp. Int. Ans.") [Ex.  4 hereto], No. 11.
Mr. Scholl, Mr. Landy, and Mr. Fien-Helfman orally trained the paralegals because there were
no manuals or other written training materials.[3]  In many cases, the paralegals working on FOIA
and CT requests had to train themselves on some aspects of the work.  Affidavit of Karline Reid
[Ex. 11] ¶8.

Initially, Mr. Fien-Helfman primarily reviewed plaintiff's CTR work, and Mr. Landy
primarily reviewed her FOIA work.  Complaint ¶20; Scholl Depo. [Deft. Ex. 3] 121.  They were
also the primary reviewers of Plaintiff's work in 2001.  Scholl Depo. [Deft. Ex. 3] 122.

Because the Paralegal Specialist position was a newly created position in the Division of
Corporation Finance when she started in August 2000, plaintiff paid close attention to the

---

[3]   It was not until November 2004 that the Office distributed a list of FOIA Research and
Document Retrieval Procedures.  See Ex. 52 [P432].

e-mails sent by Mr. Landy.  For this same reason, Mr. Landy relied heavily on the instructions

from the SEC FOIA Office to guide the paralegals through the FOIA procedures.  Simmons Aff.,

Ex. 6 hereto, ¶44.  As situations arose in processing FOIA Requests, Mr. Landy would send e-

mails to all the Paralegal Specialists, informing them how to handle the matter.  Id.  See e.g.,

Exhibit 26 [P082], 45 [P050], 46 [P093].

Mr. Scholl did not have much training or experience in handling FOIA requests; his

training was on-the-job and it had been many years since he was trained on them.  See Nix

Affidavit [Ex. 7] ¶13; Scholl Depo. [Deft. Ex. 3] 37-41.  He sometimes had to ask Plaintiff to

explain the Agency's FOIA procedures to him.  See, e.g., Ex. 29. [P101]  Also, she had to ask

Mr. Scholl to harmonize the conflicting instructions she received in office procedures.  See, e.g.,

Ex. 4. [P156].

D.  Plaintiff's Initial Work as Paralegal Specialist

Ms. Simmons's peers could tell that she had a good understanding of her job and did it

well.  See Affidavit of Karline Reid [Ex. 11] ¶¶10, 11; Nix Affidavit [Ex. 7] ¶5, 14, 35.

Between August 2000 and at least May 2001, plaintiff's reviewers --Mr. Landy, Mr.

Fien-Helfman, Julie Brimmer and Gerald Werner-- all must have given Mr. Scholl positive

feedback on plaintiff's work, because it was based upon their recommendations that Mr. Scholl

gave her a pass rating on her performance evaluation for that period.  Simmons Rebuttal [Ex. 5

hereto] ¶6.  Thus, during the first year of plaintiff's employment as a Paralegal Specialist under

Mr. Scholl (2000-2001), he passed her on all elements of her work.  Affidavit of Esther Grace

Simmons ("Simmons Aff.") [Ex. 6 hereto] ¶2.  On June 22, 2001, Mr. Scholl gave Plaintiff her

first performance appraisal as a Paralegal Specialist, GS-9, for the period of August 27, 2000,

through

April 30, 2001.  Deft. Ex. 12; Complaint ¶21; Answer ¶21; Scholl Depo. [Deft. Ex. 3] 123-124.

After consulting with Mr. Fien-Helfman and Mr. Landy, Mr. Scholl found Plaintiff's work to be

satisfactory.  Scholl Depo. [Deft. Ex. 3] 124-126.  Mr. Scholl gave her a "pass" performance

rating in all six of the critical elements on which she was evaluated, "good" ratings on some

subsidiary categories, and an overall rating of "pass."  Scholl Depo. [Deft. Ex. 3] 124; Deft.

Resp. to RFA [Ex. 3 hereto].[4]  On August 26, 2001, the Agency gave Plaintiff a within-grade

step increase from GS-9/3 to GS-9/4.  Complaint ¶22; Scholl Depo. [Deft. Ex. 3] 126-127, 129-

130.  The SF-50 stated that Plaintiff's "work performance [was] at an acceptable level of

competence."  Deft. Resp. to RFA [Ex. 3 hereto], No. 4.  Therefore, as of August 2001, Mr.

Scholl felt that Plaintiff was performing at an acceptable level.  Scholl Depo. [Deft. Ex. 3] 131.

### E.  Mr. Scholl Begins to Harass Plaintiff

In February 2002, as he admits, Plaintiff brought to Mr. Scholl's attention an error he

made.  Deft. Int. Ans. [Ex. 3 hereto], No. 8; Complaint ¶25; Pl. Int. Ans. [Ex. 1 hereto], No. 5;

Simmons Rebuttal [Ex. 5 hereto] ¶7; Scholl Depo. [Deft. Ex. 3] 131-132.  In February 2002 Mr.

Fien-Helfman assigned Plaintiff a CTR relating to *Rita Medical*.  Mr. Scholl told Mr. Fien-

Helfman he would review only that CTR since Mr. Scholl signed the CTR order on March 28,

2002.  See Ex. 46 [PL0157].  Then, after the order on the CTR was made public, he called

Plaintiff into his office and stated that she had made a mistake in processing the CTR.  Plaintiff

told him that he taught her never to sign a document with an error on it and she pointed out to

him that it was a CTR, not a FOIA and that he had used the incorrect file number.  She asked

him how he would like for her to handle the CTR request.  Then he became angry and said she

---

[4]  Under this performance rating system, employees either received a "pass" or a "fail," instead
of the previously-used ratings of Unsuccessful, Minimally Successful, Fully Successful,
Exceedingly Successful, and Outstanding.

allowed the CTR to leave the agency with the wrong file number on it, stating the 1933 Act number on it was incorrect.[5]  Plaintiff told Mr. Scholl that he should have had the secretary, Teresa Branch, change it in the computer system if he knew the number was incorrect before he signed it.  Although the CTR number did relate to another filing on *Rita Medical,* the correct number would have been *Rita Medical's* reporting number.  See Ex. 46.  Plaintiff also told Mr. Scholl that he is not perfect and that everyone makes mistakes.  See Deft. Int. Ans. [Ex. 3 hereto], No. 8; Complaint ¶25; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Simmons Rebuttal [Ex. 2 hereto] ¶7; Scholl Depo. [Deft. Ex. 3] 131-132.

Mr. Scholl did not take the criticism well and at that point he began scrutinizing Plaintiff's work hypercritically and verbally abusing her in front of other employees in the office.  Complaint ¶25; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Simmons Aff. [Ex. 6] ¶3.  See also Reid Affidavit [Ex. 11] ¶12.  Mr. Scholl frequently yelled at her, cursed at her, belittled her, and humiliated her in the office.  Pl. Int. Ans.  [Ex. 1 hereto], No. 5; Simmons Depo. [Deft. Ex. 7] 86, 90-91; Simmons Aff. [Ex. 6] ¶3.  Plaintiff's colleagues could hear him yelling at her and could hear the hostility and anger in his voice.  Nix Affidavit [Ex. 7 hereto] ¶9.

In or around March 2002 Mr. Scholl also started nitpicking plaintiff's work.  See Reid Affidavit [Ex. 11 hereto] ¶45; Ex. 22 [SEC 210]. Mr. Scholl, rather than Mr. Landy, began commenting on Ms. Simmons's work.  Mr. Scholl was training her to do FOIA's differently than Mr. Landy did.  As mentioned above, Mr. Scholl had not done FOIA's in many years, so he was not current on handling FOIA requests.  Ms. Simmons was caught in the middle between how Mr. Landy and Mr. Scholl taught her to do FOIA's.  Nix Affidavit [Ex. 7 hereto] ¶13.  Mr. Landy sometimes gave her instructions which were inconsistent with those which other SEC

---

[5]   The CTR order should have a 1934 Act number instead.

officials and he himself gave her.  See, e.g., Ex. 19 [P094]; Ex. 37 hereto [P176], Ex. 59 [P186].

An e-mail which Ms. Simmons wrote on March 8, 2002, reflects the conflicting information

which she was given and her attempt to learn the correct procedures.  Ex. 20 [SEC212].  On May

8, 2003, Mr. Landy wrote an e-mail to the paralegals telling them not to recommend to the

Division of Enforcement that it redact certain "Tandy" language in FOIA letters (Ex. 37 [P176]),

although Mr. Scholl told the paralegals that they should redact the language.

      Another example relates to pending filings.  Mr. Landy instructed Plaintiff and the other

paralegal specialists to withhold comment letters on pending filings. He reminded them of this

policy in an email on July 12, 2001 which stated:

> DON'T SEND THE FOIA OFFICE LETTERS ON PENDING FILINGS!!!!
> These letters cannot be released and letting them out of the Division increases the
> chances that someone will release them by mistake… Instead, when you get
> a request for letters on a pending filing, respond by sending the FOIA office our
> letter saying that we will not release the letters. It's very important.

[Ex. 60 [P033] (emphasis in original).  Ms. Simmons followed this policy, yet, as discussed

below, later Mr. Scholl reprimanded her and accused her of being insubordinate for not releasing

some letters in a pending investigation to a director.  See Ex. 60.

      The nitpicking was reflected in an e-mail dated March 27, 2002, by which Mr. Scholl

called Plaintiff into his office to discuss *Sheffield Pharmaceuticals*.  After she met with him, he

told her that a high school student could do the work that she did, she did not know how to do

her job; that she was "borderline failing"; and that he planned to demote her.  Ex. 58. [P056].

Yet, despite this threat, Mr. Scholl continued to sign off on her work – i.e., place his initials on

her work so it could be forwarded to the AD Group or other appropriate division.  See Ex. 58.

      There is evidence that the negative treatment Ms. Simmons received from supervisors

and colleagues was orchestrated.  When Mr. Scholl began targeting Ms. Simmons, he, Mr.

Landy, and Mr. Fien-Helfman would leave the office together at lunch time.  After Ms. Simmons

was fired, these three men no longer left for lunch together.  Nix Affidavit [Ex. 7 hereto] ¶22.

Further, the record is replete with e-mails from Mr. Landy to Mr. Scholl "tattling" on mistakes

he thought plaintiff made.  See, *e.g*., Ex. 21 hereto [SEC211].  In at least one case Mr. Landy had

to correct himself.  See Ex. 22 hereto [SEC210].  Mr. Scholl directly or indirectly turned Mr.

Landy, Mr. Fien-Helfman, and others against plaintiff.  After Mr. Scholl became hostile towards

her, they also became hostile towards her.  Reid Affidavit [Ex. 11] ¶15; Nix Affidavit [Ex. 7]

¶24-26; Deft. Ex. 8, pp. 268-271.

Meanwhile, in March 2002, plaintiff told Mr. Scholl that if he did not stop treating her

badly, she was going to take him to court for treating her terribly.  Simmons Depo. [Deft. Ex. 7]

93-94.

### F.  Plaintiff's 2001-2002 Evaluation

Between August 28, 2001 and April 30, 2002, Plaintiff's work performance did not

decline.  See Complaint ¶23.  Rather, she improved, as she explained to Mr. Scholl in a

memorandum dated May 9, 2002 (Ex. 24 hereto).  She missed work for nearly two months,

between August 15 and October 3, 2001, due to surgery, but during that period she assisted her

colleagues who were covering her work.  Id.  Also during this performance period she received

kudos from her colleagues and supervisors.  At least twice during this period, in February and on

April 29, 2002, FOIA supervisor Richard Landy complimented her on her work, writing that she

did a "good job."  Exs. 62, 63 [P046, P063].  See, e.g., Exs. 18, 19, 28 [SEC215, P0094, P085].

However, in July 2002, Mr. Scholl gave Plaintiff a Performance Appraisal for May 1,

2001, through April 30, 2002, with a "fail" rating on three critical elements and a "pass" rating

on the other three critical elements.  Complaint ¶24; Answer ¶24; Scholl Depo. [Deft. Ex. 3] 138;

Deft. Ex. 17.  Plaintiff did not deserve the poor evaluation.  Pl. Int. Ans.  [Ex. 1 hereto], No. 5;

Deft. Ex. 36, pp. 43-45.  Indeed, three months earlier, on March 27, 2002, before the rating

period had ended, Mr. Scholl had angrily told plaintiff that he intended to demote her.  See

above, p. 8.  See Exs. 37, 58 [P056, P043].

Yet others who reviewed Plaintiff's work found it acceptable.  For instance, Kay Reid,

another experienced paralegal specialist with whom Plaintiff shared an office, would double-

check her work before she submitted it to Mr. Scholl.  Ms. Reid would tell her that the work was

correct; that the research was complete; and that it was up to par with work she herself

submitted.  Nonetheless, Mr. Scholl would still find something wrong with plaintiff's

submissions and mark it up.  Simmons Aff. [Ex. 6] ¶8; Reid Affidavit [Ex. 11] ¶10.  In addition,

Mr. Landy, who primarily reviewed her work between August 2001 and early 2002, and Aaron

Taylor, a Research Specialist, often praised her on her work.  For example, on February 11,

2002, Mr. Landy wrote, "good job Grace," on a post-it-note to praise her for doing a perfect job

on a memo and submitting it four days before it was due.  Ex. 62. [P046].  Also, on FOIA

Request No. 2002-1633, dated July 9, 2002, Mr. Landy wrote, "Very good catch Grace,"

concerning a pending investigation discovered by conducting an NRSI search.  Ex. 28 hereto

[P085].  On a number of occasions, even though Mr. Landy had approved Plaintiff's memo (as

shown by his initials), Mr. Scholl still found fault with the final product!  See, e.g., Ex. 48

[PL0293-295, 298]

Furthermore, Mr. Scholl could not point out any rules or substantive errors that she

committed and he could not specify how her work did not comply with the existing division

procedures and instructions.  Pl. Int. Ans. [Ex. 1 hereto], No. 5.  In fact, these procedures

frequently changed.  For example, in May 2002 plaintiff drafted a FOIA response relating to

*Circuit City Stores*, which stated that certain documents should not be released due to a pending investigation. Her supervisors apparently questioned its wording, yet the office issued a final memo which was virtually identical to plaintiff's draft except for some "boilerplate." See Ex. 25 hereto [P070-72]. Two months later, Mr. Landy instructed the paralegals in the office to withhold documents for release if there was a pending investigation by SEC's Division of Enforcement. See Ex. 26 hereto [P082].

It appeared to others that Mr. Scholl or someone was even sabotaging plaintiff's work. See Nix Affidavit [Ex. 7] ¶14; Simmons Affidavit [Ex. 6] ¶30; Reid Affidavit [Ex. 11] ¶16. Someone seemed to have remote control of Ms. Simmons' computer to make changes in her work after she submitted it, so that it would look as if she was making errors. Simmons Affidavit [Ex. 6] ¶30; Nix Affidavit [Ex. 7 hereto] ¶15. For example, one time Ms. Simmons showed her colleague, Katie Nix, a Staff Accountant, a document she had prepared which had been retyped by someone else after she had typed it. Simmons Affidavit [Ex. 6] ¶30; Nix Affidavit [Ex. 7 hereto] ¶14. Even worse, once when Ms. Simmons and Ms. Nix were standing in her office, several feet from Plaintiff's computer, they saw the cursor move around the screen of her computer! No one else was in the office; the cursor on Ms. Simmons's computer was being manipulated by remote control! Justifiably concerned, Ms. Simmons began to save her comment letters on the A: drive and remove the disk from the computer when she was finished. Simmons Affidavit [Ex. 6] ¶30; Nix Affidavit [Ex. 7 hereto] ¶15. Ms. Simmons felt that Mr. Scholl would lie about things, so every morning she would e-mail herself to prove she had arrived at work on time because she was afraid that Mr. Scholl would say she did not. Simmons Affidavit [Ex. 6] ¶30; Nix Affidavit [Ex. 7 hereto] ¶17. Moreover, in September 2002 she discovered that the agency had not installed an important software tool on her computer

(ADHOC) or trained her on it.  See Ex. 32 hereto [P117].  No other Paralegal Specialist had the same problem.

For the foregoing reasons, Mr. Scholl should have given her pass ratings on all elements. Pl. Int. Ans.  [Ex. 1 hereto], No. 5.

Because Mr. Scholl rated her as failing in three critical elements, Plaintiff did not receive a pay increase in August 2002 and became ineligible for the Agency's Student Loan Repayment program, whereby she could be reimbursed for some of the money she spent in obtaining her Master's degree.  Complaint ¶24; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

Plaintiff did not agree with the July 2002 appraisal at all and believed that Mr. Scholl was discriminating against her.  By memorandum to Mr. Scholl, Office Chief, James M. Daly, Associate Director of the Division of Corporation Finance, and Shelly E. Parratt, Principal Associate Director, dated August 7, 2002, Plaintiff requested reconsideration of Items I, II, III, and IV of her performance evaluation.  Deft. Resp. to RFA [Ex. 3], No. 8; Complaint ¶29; Pl. Int. Ans. [Ex. 1 hereto], No. 5.  In her rebuttal, she was critical of Mr. Scholl.  For example, in defending her communication skills, she wrote, *inter alia*:

> You indicated that I do not display communication skills needed in persuasive writing. You also indicated that I lack common sense in work relations.  You failed to give specifics concerning any interaction with others relating to office matters.  You further failed to specify any written examples of illogical and inconsistent written documents. You failed to recognize your instruction for me to handle more EDGAR calls and CT inquiries.  You further failed to specify any communication breakdown with the reviewer concerning assignments.  During this rating period you failed to conduct regular assessments of my performance or provide feedback and conferences to help me direct and focus my efforts.  You did not administer fair rewards and punishments.  You failed to adopt participating management by displaying a lack of tolerance and patience for disagreement and the practice of independent thought.  Therefore, there was a lack of appropriate supervision when problems arose in the work.  You failed to explain certain assignments clearly and provide effective statements of managerial decisions.

[SEC 312, Deft. Ex. 36, p. 34]

Around this time, Plaintiff also informed Mr. Scholl that his actions constituted

"disparate treatment" and advised him that she would be fighting this treatment in court.
Complaint ¶3; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Scholl Depo. [Deft. Ex. 3] 145-146; Simmons
Depo. [Deft. Ex. 7] 85, 93-94.  At some point, as Mr. Scholl acknowledged, Ms. Simmons also
accused him of "discriminat[ing] against black female employees who had a college education."
Scholl Depo. [Deft. Ex. 3] 147.

In late 2002, when Mr. Scholl was absent from the office, Mr. Landy reviewed Plaintiff's
work on a FOIA request for the Crane Company.  See Simmons Rebuttal [Ex. 2] ¶8.  Forgetting
that he was no longer supposed to review her work, Mr. Landy returned it with just his initials in
the corner, indicating that her work was correct.  However, when he remembered, he asked
Plaintiff to hold her work until Mr. Scholl returned.  When Mr. Scholl returned and reviewed her
work on the Crane Company FOIA request, he made numerous corrections.  See Ex. 27.

### G.  Mr. Scholl Gives Plaintiff a PIP

Plaintiff's work in 2002 continued to be good.  Complaint ¶46; Pl. Int. Ans. [Ex. 1
hereto], No. 5; Simmons Afft. [Deft. Ex. 36], p. 8 ¶17.  However, Plaintiff's supervisors
continued to view her work hypercritically, without good cause.  For example, in August 2002
Plaintiff complied with a request by an internal SEC requestor regarding *The Stanley Works* and
correctly followed office policy (see Ex. 26 [P082], discussed above) by not releasing some
letters due to a pending investigation.  However, an Assistant Director wanted more documents
and Mr. Landy suggested that she was being insubordinate by not giving the Assistant Director
the documents.  Ultimately the final FOIA memorandum which Ms. Simmons signed reflected
that she was correct in her analysis of the request.  See Ex. 30 [P104-107].  Also in August 2002,
when Plaintiff gave Mr. Landy a FOIA response to meet a quota on producing three or more
FOIA requests each day, Mr. Landy stated, "Grace, you are going to get us fired," suggesting

that she took an incorrect position in the response, when in fact she was complying with the

policy on not releasing documents when there was a pending matter under investigation.  See Ex.

31 [P110].  See also p. 9, above.

Between July 2002 and October 1, 2002, Plaintiff did not receive any further documents

from Mr. Scholl criticizing her performance.  Complaint ¶33; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

Nor did  Mr. Scholl verbally communicate with her during this period. See Plaintiff's Afft. [Ex.

6] On August 23, 2002, Mr. Daly denied plaintiff's request for reconsideration of her July 2002

ratings.  Complaint ¶31; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 3], No. 9.  On

August 28, 2002, Plaintiff filed a grievance with her union, the National Treasury Employees

Union (NTEU), regarding the appraisal.  Complaint ¶32; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft.

Ans. to RFA, No. 10; Scholl Depo. [Deft. Ex. 3] 147-148. On October 1, 2002, without prior

notice, Mr. Scholl gave her a Notice of Opportunity to Improve Performance.  In it, Mr. Scholl

informed Plaintiff that he was placing her on a Performance Improvement Plan ("PIP") and

giving her 90 days to improve her performance levels in the three critical elements in which he

gave her "fail" ratings on her July 2002 Performance Appraisal.  Complaint ¶34; Answer ¶34; Pl.

Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA, No. 13.  He also informed Plaintiff that he

would be meeting with her regularly to discuss her performance and that he and he alone would

be reviewing her work.  Complaint ¶35.  See also Answer ¶35; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

A chart of FOIA requests which Plaintiff and her colleagues handled in October 2002 indicates

that Mr. Scholl only reviewed her work.  See Ex. 33 [P134].  Thereafter, Plaintiff again objected

to Mr. Scholl's inequitable treatment of her.  Complaint ¶36; Answer ¶36.[6]

After October 1, 2002, and until the conclusion of the PIP in early 2003, Mr. Scholl

_____

[6] Mr. Scholl testified that he did not recall whether Ms. Simmons accused him of discrimination

reviewed Plaintiff's entire work product except when he was out of the office on vacation for two weeks.  Deft. Ans. to RFA [Ex. 3 hereto], No. 14; Scholl Depo. [Deft. Ex. 3] 154-155, 160. He went on vacation during the first two weeks of Plaintiff's PIP and did not leave any instructions on how to perform the work or what steps she should take to make improvements. Simmons Aff. [Ex. 6] ¶9.

During Mr. Scholl's vacation, she submitted her work to Richard Landy, the FOIA supervisor, and Mr. Landy placed his initials on her work, indicating that he considered it correct.  Simmons Aff. [Ex. 6] ¶10.  See Ex. 27 hereto.  When Mr. Scholl returned from vacation, on October 10, he marked up the work which Mr. Landy had previously indicated as correct and argued that Mr. Landy should not have placed his initials on the work to indicate that it was correct.  See Ex. 27 hereto.  Also, whenever Mr. Landy would tell Mr. Scholl that her work was correct, Mr. Scholl would ignore his statements.  Simmons Aff. [Ex. 6] ¶¶9-12.

Further, Mr. Scholl refused to explain how she could improve her work.  For example, on November 19, 2002, Mr. Scholl criticized her for using the word, "effective," to describe a 10-K filing.  When she asked him to explain the correct terminology, he told her that she should have learned it from somebody else and did not tell her the correct term to use.  Ex. 34 hereto [P138]. Nonetheless, Mr. Scholl whenever Plaintiff used the word, "effective," to describe a filing, he objected without ever explaining the term he wanted her to use.  See e.g., Exs. 61, 64 [SEC 161, SEC 2705].  In the same conversation Mr. Scholl cursed plaintiff and asserted, "Goddamn Grace. You don't listen and that's why you don't get the work right . . . ."  Id.   See also Nix Affidavit Ex. 7 hereto] ¶11.

During the PIP Plaintiff continued to perform satisfactorily.  Thus, she remained timely

---

at that point.  Scholl Depo. [Ex. 9 hereto] 154.

in completing her work, as shown on a clipboard kept in the branch. Ex. 65 [P134]. For

example, a list of CTRs between October 1, 2002, and December 31, 2002, shows that she

handled 8 CTRs during the PIP, and completed each one within several days after it was

received in the office. Ex. 66 [P142]. During the same period she completed 17 FOIA requests.

Ex. 67 [P143].

On November 18, 2002, the NTEU and the Agency entered into a Grievance Transition

Agreement that provided for the resubmission of Plaintiff's grievance at Step 1 of the grievance

procedure contained in the collective bargaining agreement between NTEU and the Commission.

Deft. Ans. to RFA [Ex. 7], No. 16; Complaint ¶36.

Meanwhile, Mr. Scholl continued to make highly disparaging comments about Plaintiff's

performance, in a blatant attempt to make her quit. Thus, on November 19, 2002, during a

discussion with Mr. Scholl about her performance, he stated that he put her on a PIP to prove that

she is "incompetent as a paralegal specialist," although the true purpose of a PIP is to help an

employee improve her performance to the satisfactory level, and he said he wanted to demote her

after 90 days to a lesser position, such as secretary. See Ex. 68 [P139]. Similarly, on December

4, 2002, even though she had been on the PIP for only 60 of its 90 days, Mr. Scholl called

Plaintiff into his office and told her that he had no intention of giving her a "pass" rating on her

PIP. Complaint ¶37; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ex. 36, p. 50. He stated that he

had spoken with her FOIA and CTR reviewers, and they had agreed she should not receive a

pass rating, even though both reviewers had given her positive feedback on her work. Complaint

¶37; Pl. Int. Ans. [Ex. 1 hereto], No. 5. Then Mr. Scholl stated (falsely) that her NTEU union

representative, Gerald Werner, agreed that Plaintiff should be demoted to a secretary, GS-6, and

told her he could get her a position as his secretary.[7]  Complaint ¶37; Pl. Int. Ans. [Ex. 1 hereto],

No. 5.  Mr. Scholl claimed that no other office would take her as a secretary, despite the fact that

she had received extremely positive performance appraisals as a secretary for twelve years

before she became a Paralegal Specialist.  He went on to assert that if Plaintiff did not accept this

demotion and become his secretary, he would fire her immediately.  Complaint ¶37; Pl. Int. Ans.

[Ex. 1 hereto], No. 5.

Also, in late 2002, when Ms. Simmons was a Grade 9, Mr. Scholl told Ms. Nix,

Plaintiff's union representative, that he was doing Ms. Simmons's evaluation (even though the

time for evaluations had passed).  Mr. Scholl told Ms. Nix that he had to wait for the union

contract to be signed before he could evaluate Ms. Simmons and that if he "passed" Ms.

Simmons, he would have to promote her to a Grade 11.  (This was a misinterpretation of the

union contract.)  Interestingly enough, in that conversation Mr. Scholl did not mention anything

to Ms. Nix about any inadequacy of her work.  He then "failed" Ms. Simmons as a Grade 9 and

demoted her to a Grade 7.  Nix Affidavit [Ex. 7 hereto] ¶12.

The PIP and threats were unwarranted because Plaintiff's work performance still had not

declined from June 2001, when she received a "pass" rating on her performance appraisal from

Mr. Scholl.  Complaint ¶38.  At about this time Plaintiff complained again to Mr. Scholl about

his disparate treatment of her.  Complaint ¶37; Pl. Int. Ans. [Ex. 1 hereto], No. 5.  Plaintiff

describes her performance and Mr. Scholl's harassment in a memo to the NTEU dated February

3, 2002 [actually 2003].  Ex. 37 hereto [P043].

Around this time, Mr. Scholl told another supervisor, whom plaintiff had approached

about a possible transfer, that she could not do the work of a paralegal specialist, thereby

---

[7]  Mr. Werner later told Plaintiff that this statement was untrue.  Complaint ¶37; Pl. Int. Ans.

impeding her transfer from Mr. Scholl.  Complaint ¶38; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

On December 18, 2002, Plaintiff's union resubmitted her grievance to Mr. Daly for

consideration, as agreed, and on January 8, 2003, Mr. Daly denied the grievance.  Complaint

¶39; Answer ¶39; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 7], Nos. 19, 20.

### H.   The Agency Demotes Plaintiff

On March 28, 2003, Mr. Daly sent Plaintiff a Notice of Proposed Reduction in Grade for

Unsuccessful Performance, informing her that because of her allegedly unsuccessful

performance on her PIP, the Agency was proposing her demotion from a Paralegal Specialist,

SK-9, to a Paralegal Specialist, SK-7.  Complaint ¶40; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

On or about April 7, 2003, in response to this notice, Plaintiff wrote a letter to Mr. Daly,

Mr. Beller, and Jayne Seidman, Associate Executive Director, Office of Administrative and

Personnel Management, refuting Mr. Scholl's allegations of unsuccessful performance and

attaching supporting documents.  Complaint ¶43; Answer ¶43; Complaint ¶41; Answer ¶41.

Deft. Ans. to RFA [Ex. 3 hereto], No. 22.  In it Plaintiff complained of "verbal abuse from Herb

Scholl and others regarding [her] assignments."  Deft Ex. 22, p. 2.  She also submitted

documents in support of her argument that she deserved a satisfactory rating.

On June 9, 2003, Mr. Beller, the deciding official in the subject proposal, gave her the

opportunity to respond orally to the Notice of Proposed Reduction in Grade.  Plaintiff gave an

oral reply in opposition to the proposal.  Complaint ¶42; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft.

Ans. to RFA [Ex. 3 hereto], No. 23. See also Answer ¶42.  On July 18, 2003, Mr. Beller decided

to reduce Plaintiff's grade to SK-7, effective July 27, 2003.   Complaint ¶43; Answer ¶43; Pl. Int.

Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 3 hereto], No. 24.

---

[Ex. 1 hereto], No. 5.

On July 28, 2003, because of all of the difficulties Plaintiff was having with Mr. Scholl and because the Agency did not heed her repeated complaints about his inequitable treatment, she requested reassignment as a paralegal in the Commission's Atlanta, Georgia District office. Complaint ¶44; see Deft. Ans. to RFA [Ex. 3], No. 25; Simmons Depo. [Deft. Ex. 7] 67.  On July 28, 2003, Plaintiff was placed on the Commission's "List for Hardship Reassignment," in which she asked to be reassigned to the Commission's Atlanta, Georgia office.  Deft. Ans. to RFA [Ex. 3 hereto], No. 25; Simmons Depo. [Deft. Ex. 7] 69.  However, the Agency did not reassign her anywhere.  Complaint ¶44; Answer ¶44; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

Also on July 28, 2003, the union invoked arbitration on her behalf to contest Plaintiff's demotion to SK-7.  Complaint ¶45; Answer ¶45; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 3 hereto], No. 27.

Plaintiff continued to work as a Paralegal Specialist at her same good performance level. Complaint ¶46; Pl. Int. Ans. [Ex. 1 hereto], No. 5.  She continued to receive kudos from colleagues and others who reviewed her work.  See, *e.g.*, Exhibit 38 hereto [PL0423].

Then, on October 16, 2003, Ms. Carol Smith, Deputy Associate Director, informed Plaintiff that the Agency would delay her reduction in grade from July 27 to October 19, 2003, because of the pending arbitration proceeding.  Complaint ¶42; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 7], No. 28.  In fact, the reduction in grade became effective on or about October 19, 2003.  Complaint ¶48; Complaint ¶48; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 7], No. 29.

On or about October 30, 2003, Mr. Scholl gave Plaintiff a Performance Plan and Evaluation of her work as a SK-9 from May 1, 2002, to October 2, 2003.  He gave her a performance rating of "acceptable."  Complaint ¶49; Answer ¶49; Pl. Int. Ans. [Ex. 1 hereto],

No. 5; Deft. Ans. to RFA [Ex. 7], No. 30.  When Plaintiff met with Mr. Scholl on October 2,

2003, to discuss the evaluation, Mr. Scholl said that he was "passing" her as a SK-7, not a SK-9,

although she had worked as a SK-9 for almost all of the evaluation period, and he crossed

through her SK-0950-09 grade and wrote above it, "0950-07."  Complaint ¶50; Pl. Int. Ans. [Ex.

1 hereto], No. 5; Ex. 13 hereto [SEC2569]; see also Answer ¶50.

Thereafter, Plaintiff's union proceeded to arbitrate her demotion grievance, and an

arbitration hearing was held on January 6 and 7, 2004.  Complaint ¶51; Answer ¶51; Pl. Int. Ans.

[Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 7], No. 33.  Mr. Beller also did not know how few

errors Plaintiff would have to make to be considered acceptable.  Id., p. 70.  In the arbitration

hearing Mr. Beller acknowledged that, in her response to the evaluation, Plaintiff had

complained of "abusive behavior" by Mr. Scholl.  See Deft. Ex. 8, p. 69.  Also in that hearing,

Ms. Nix testified that Mr. Scholl had informed her that he was going to give Plaintiff a failing

evaluation in July 2002, not because he thought that she was doing failing work, but because he

did not want her to receive a pay increase to SK-11, which would be automatic under the union

contract if she received a passing evaluation at that time. Complaint ¶52; Answer ¶52; Deft. Ans.

to RFA [Ex. 7], No. 34.  According to the Agency, Ms. Nix testified as follows:

> And then he said, "I had to wait for the union contract to be signed."  And I said, "Herb,
> what does the union contract have to do with Grace's evaluation?"  And then he looked at
> me and I said, "Oh," because I know there was a section in there, an article in there that
> talks about promotions if you pass.  It's really more complicated than that.  It doesn't
> actually say you have to just pass somebody if you, you know, promote them if you pass
> them if it's journeyman level.  But I said, "Oh," and then we just sort of looked at each
> other.  And then he said, if I pass Grace I'll have to promote her."  And I just walked out
> of the office.

Deft. Ans. to RFA [Ex. 7 hereto], No. 34. The union introduced other evidence to support

Plaintiff's grievance.  Notwithstanding the evidence in Plaintiff's favor, the arbitrator denied

Plaintiff's grievance on or about March 19, 2004.  Complaint ¶50; Answer ¶50; Deft. Ans. to

RFA [Ex. 7], No. 35.  As a result, she remained an SK-7 paralegal specialist.  Complaint ¶52.

After the arbitration decision, Plaintiff continued doing her work well and Mr. Scholl continued to be the exclusive reviewer of Plaintiff's work.  Complaint ¶53.  A FOIA Request Log of May 1, 2002-October 2, 2003, shows her huge volume of work.  Ex. 69 [P194-199].

## I.  Mr. Scholl's Bad References to the Superior Court on Plaintiff

To avoid Mr. Scholl's continuing hypercritical scrutiny and verbal abuse, on or about May 18, 2004, Plaintiff applied for a position as a Courtroom Clerk for the Superior Court of the District of Columbia.  Plaintiff interviewed for the position three times and was eventually rejected for the position.  Complaint ¶54; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Simmons Depo. [Deft. Ex. 7] 45-46, 50; Simmons Aff. [Ex. 6] ¶¶13-16.  In the second interview with Andrew Moore of that court, the interviewers indicated to Ms. Simmons that they had called the SEC for a reference and, based on what the SEC told them, they wanted Mr. Moore's manager to participate in a third interview.  Simmons Depo. [Deft. Ex. 7] 48-49.  When she went back for a second interview, Mr. Moore told her that they had found out she was incompetent and could not do the work, so they wanted to see whether she could read and write.  Therefore, they gave her a paper to read and asked her to write some facts in a docket.  Simmons Depo. [Deft. Ex. 7] 49; Simmons Aff. [Ex. 6] ¶15.  In the third interview the court interviewers gave plaintiff something to read, to show that she knew how to read.  Afterwards, a Mr. Brown, who was Mr. Moore's supervisor and another one of the interviewers, asked if there was someone else at the SEC other than Mr. Scholl whom they could speak to for a reference.  Mr. Moore then informed Plaintiff that her supervisor, Mr. Scholl, was giving out bad references on her and asked, "Doesn't he [Mr. Scholl] know that that's against the law?"  Rather than use Mr. Scholl as a reference again, Plaintiff gave them the name of Adam Ramsey in Human Resources.  Simmons Aff. [Ex. 6] ¶16.

Upon information and belief, the Superior Court intended to hire Plaintiff until Mr.

Moore contacted Mr. Scholl for a reference for Plaintiff, and Mr. Scholl provided Mr. Moore

with such a poor inaccurate reference, indicating that Plaintiff lacked the ability to read or write,

that the court decided not to hire Plaintiff.  Complaint ¶55; Pl. Int. Ans. [Ex. 1 hereto], No. 5;

Simmons Depo. [Deft. Ex. 7] 47-48.  In addition, Teresa Branch, Mr. Scholl's secretary at the

SEC, told plaintiff that she had recently bowled with Mr. Moore at a local bowling alley.  (Ms.

Branch and Mr. Moore had bowled together before.)  Simmons Depo. [Deft. Ex. 7] 58-59.  At

that time, Mr. Moore asked Ms. Branch whether she knew Esther Simmons.  When Ms. Branch

replied that she did, Mr. Moore told her that he was going to hire plaintiff in 2004 until he

received a bad reference on her.  On October 13, 2004, Mr. Scholl admittedly responded to

questions inquiring about plaintiff from a person identifying herself as Cheryl Dixon of the U.S.

Court.  Deft. Ans. to RFA [Ex. 7], No. 40.  Scholl Depo. [Deft. Ex. 3] 238-239.  He admittedly

told Ms. Dixon, "[Y]ou have to understand that anything I give you as a reference with respect to

Grace that she and I do not necessarily agree on the quality or quantity of her work. . . . . [y]ou

should talk to her because she and I have had disagreements about this."  Scholl Depo. [Deft. Ex.

3] 240.  He went on to give Plaintiff ratings of 2 or 3 on scale of 1 to 10 on at least two of six

questions which Ms. Dixon asked him and ratings of 6 or 7 in responding to at least three

questions.  Scholl Depo. [Deft. Ex. 3] 241.

### J.  Mr. Scholl Gives Plaintiff Another PIP

In 2004 Plaintiff continued to work as a paralegal specialist at her same good

performance level.  See Deft. Ex. 36, p. 11 (¶34), p. 12 (¶38).

The union suspected that Mr. Scholl was assigning plaintiff a disproportionate number of

CTR's in addition to the FOIA requests she was assigned and in February 2004 asked for

information about the numbers of FOIA's and CTR's each of the three paralegals did.  Ex. 40 hereto [SEC361].  In March 2004, right after she printed out a draft copy of the CTR Substantiation special project, Mr. Landy tried to dispute Plaintiff on the number of FOIA requests in a special assignment that she had handled, but ultimately admitted that he gauged the number incorrectly.  See Ex. 41 [PL0552, PL0559, PL0553].  During 2004, because she knew her supervisors would cast doubt on the quantity of her work, Plaintiff continued to document carefully all of her work and to show she was completing it timely.  See, *e.g.*, Ex. 42 [PL0562], Ex. 43 [PL0580].  During the rating period Plaintiff successfully met all of her performance standards.  See Ex. 70. [PL0605-06].

However, on June 3, 2004, Mr. Scholl gave Plaintiff a Performance Plan and Evaluation for October 3, 2003, through April 30, 2004, in which he rated her performance as "unacceptable."  Complaint ¶56; Answer ¶56; Pl. Int. Ans. [Ex. 1 hereto], No. 5.[8]  On June 24, 2004, Mr. Scholl gave Plaintiff another Notice of Opportunity to Improve Performance, placing her on a 60-day PIP to improve her work performance to what he regarded as an acceptable level.  Complaint ¶58; Answer ¶58; Pl. Int. Ans. [Ex. 1 hereto], No. 5.[9]

During this PIP Plaintiff continued to do her work well.  Complaint ¶60.  See Deft. Ex. 36, p. 12 (¶¶38, 39).

The 60-day PIP period ended on or about August 24, 2004, but the Agency admittedly took no adverse action against plaintiff between August 24, 2004, and October 31, 2004.  Complaint ¶59; Pl. Int. Ans. [Ex. 1 hereto], No. 5; see Answer ¶59; Deft. Ans. to RFA [Ex. 7],

---

[8]  Plaintiff contacted her union about this evaluation, but the union advised her that the Agency would only deny her grievance again, so Plaintiff did not file a new grievance.  Complaint ¶57; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

Nos. 43, 44.  On November 1, 2004, based on Mr. Scholl's review of Plaintiff's work during the

60-day period of her PIP, Mr. Daly sent her a Notice of Proposed Removal for Unsuccessful

Performance.  Complaint ¶61; Answer ¶61; Pl. Int. Ans. [Ex. 1 hereto], No. 5.  The notice, based

entirely on the opinions of Mr. Scholl, alleged a number of instances in which Mr. Scholl

thought Plaintiff's performance was unsuccessful.  Complaint ¶62; Pl. Int. Ans. [Ex. 1 hereto],

No. 5.  In the notice, Mr. Scholl alleged that during her performance improvement period of June

24 to August 23, 2004, Plaintiff unsuccessfully performed her job in three critical job elements --

knowledge of field or occupation, execution of duties, and communications, and purported to

provide examples of each.  However, Mr. Scholl misrepresented Plaintiff's work, took it out of

context, provided examples that did not support his conclusions, and provided at least one

example of a request which Plaintiff had done before her 2004 PIP.  Complaint ¶63. See Deft.

Ex. 36 p. 22 (¶66).  The deciding official, Mr. Beller,  must have realized this was inappropriate

because he did not refer to this request.

Also on November 1, 2004, Valerie Lewis, an African-American female, was promoted

to Branch Chief, reporting to Mr. Scholl, and Ms. Lewis became Plaintiff's direct supervisor.

Complaint ¶64; Answer ¶64; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Deft. Ans. to RFA [Ex. 3

hereto], No. 38.  Ms. Lewis had 13 years' experience in responding to FOIA requests and

handling CTRs, much more experience than Mr. Scholl.  Lewis Depo. [Deft. Ex. 35] 13.

Once Mr. Scholl was no longer reviewing Plaintiff's performance, for the first time in

several years, she received little or no negative feedback on her work.  She submitted numerous

FOIA request responses to Ms. Lewis, and Ms. Lewis made few, if any, corrections on her work.

---

[9]  When she acknowledged its receipt, Plaintiff indicated to Mr. Scholl, "Whoever is monitoring
my computer is also aware that you gave me this PIP today."  Ex. 71 [PL0653]; Affidavit of
Grace Simmons [Ex.6 hereto] ¶34.  See also Ex. 72 [PL0667].

Complaint ¶65; Pl. Int. Ans. [Ex. 1 hereto], No. 5. Ms. Lewis did not tell Plaintiff that her work was unacceptable. Deft. Ans. to RFA [Ex. 7], No. 49. Rather, she found that in responding to FOIA requests, Plaintiff had not made many errors, and that Plaintiff was performing adequately at her grade level. Lewis Depo. [Deft. Ex. 35] 20, 22.[10]

However, in late November 2004, Mr. Scholl ordered Ms. Lewis to give him Plaintiff's work to review again. Complaint ¶66; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Scholl Depo. [Deft. Ex. 3] 225. As Ms. Simmons' direct supervisor, Ms. Lewis should have been the primary reviewer of Ms. Simmons's work, Scholl Depo. [Deft. Ex. 3] 219-225, since she would have been the official to evaluate Plaintiff's work.

Thereafter, Mr. Scholl resumed scrutinizing Plaintiff's work hypercritically, as he had done before. Complaint ¶67; Pl. Int. Ans. [Ex. 1 hereto], No. 5. In addition, he kept her work for an unduly long period, as Plaintiff noted in an e-mail to Ms. Lewis (Exhibit 73 hereto). Other than telling Ms. Lewis that he "need[ed] to see [Plaintiff's work]," Mr. Scholl did not "discuss[ ] Ms. Simmons's work or anything that was going on with Ms. Simmons." Scholl Depo. [Deft. Ex. 3] 227. At that time Mr. Scholl reviewed no other paralegal specialist's work. Deft. Ans. to RFA [Ex. 7], No. 51; Complaint ¶66; Pl. Int. Ans. [Ex. 1 hereto], No. 5.

On or about November 23, 2004, Plaintiff submitted her opposition to the Notice of Proposed Removal to Mr. Beller, Director, Division of Corporation Finance. Deft. Ex. 36. Plaintiff provided a lengthy and detailed affidavit, along with over 30 exhibits, to refute Mr. Scholl's claims. She also contended that Mr. Scholl's treatment of her demonstrated a pattern of discriminatory and retaliatory conduct against her and that the removal would constitute

---

[10]  Mr. Scholl did not even know whether Ms. Lewis had problems with Plaintiff's work. Scholl Depo. [Deft. Ex. 3] 228.

discrimination and retaliation.  Complaint ¶68; Pl. Int. Ans. [Ex. 1 hereto], No. 5.  On the same

day Ms. Lewis wrote a letter of recommendation for Plaintiff (Ex.  53 hereto), which was very

complimentary.  In that recommendation, Ms. Lewis described Ms. Simmons' work performance

as follows:

> Ms. Simmons performs these computerized searches quickly and accurately with
> enthusiasm.  She routinely inquires about additional assignments.
>
> Ms. Simmons proofreads the FOIA recommendations to ensure there are no
> typographical errors and incorrect references. She has a solid understanding of the
> FOIA exemptions and how to apply them in the assignment. Ms. Simmons
> provides clear and accurate information about available and unavailable I
> information.
>
> …
>
> She is knowledgeable about processing FOIA request by identifying and
> retrieving the documents needed to respond to the FOIA requestor.

Regarding Plaintiff's ability to listen and follow directions, Ms. Lewis stated:

> Ms. Simmons follows instructions and listens when work is explained .  She is
> receptive to constructive criticism.

Id.

Plaintiff continued to work under Ms. Lewis's supervision and Mr. Scholl's scrutiny from

November 2004 through January 2005.  Complaint ¶69; Pl. Int. Ans. [Ex. 1 hereto], No. 5.  By e-

mail dated January 6, 2005, in answer to a question by Plaintiff about his reviewing her

assignments, Mr. Scholl wrote Plaintiff (Ex. 55 hereto):

> I am not you (sic) immediate supervisor although I will be reviewing your work from
> time to time.  Please continue to give your completed assignments to Ms. Lewis, your
> supervisor.

See Ex. 73 [PL0888].

On or about January 28, 2005, Mr. Beller issued Plaintiff a Removal Decision for

Unsuccessful Performance, removing her effective February 11, 2005.  Complaint ¶70; Answer

¶70; Pl. Int. Ans. [Ex. 1 hereto], No. 5.  In the decision, Mr. Beller cited only nine of the thirteen

instances which Mr. Scholl alleged constituted Plaintiff's Unsuccessful Performance.  Complaint

¶70.  See Deft. Ex. 37.

K.   <u>The Agency Gives Plaintiff More Bad References</u>

On or about April 28, 2005, after the Agency terminated her, Plaintiff applied to a Home

Depot store in Hyattsville, Maryland, as a Night Inventory Clerk.  On the application, she

indicated that she had been discharged from an employer.  On April 29, Plaintiff contacted Home

Depot about her application and spoke with someone in the personnel office, who advised her

that Home Depot was impressed with her education background and experience, but when it had

contacted the Agency for a reference, the Agency reported that Plaintiff had an employment

dispute with the Agency that was being investigated at this time and that for that reason, Home

Depot would not hire her.  Complaint ¶71; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Simmons Depo.

[Deft. Ex. 7] 61-63.  Upon information and belief, the personnel office of Home Depot spoke

with Mr. Scholl and Mr. Scholl, provided the office with a bad, false reference for Plaintiff.

Complaint ¶72; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Simmons Depo. [Deft. Ex. 7] 63.

On June 5, 2005, Plaintiff had another interview at the D.C. Superior Court, and the

interviewer asked her for another reference.  She gave them the complimentary letter written by

Ms. Lewis.  Simmons Aff. [Ex. 6] ¶17.  Nonetheless, the court rejected her for the position.  <u>Id</u>.

Thereafter, Plaintiff moved to Savannah, Georgia, and in July 2005 consulted with

Carolyn Trosdal, Vice President at Wachovia Securities and an old family friend, about her

Thrift Savings Plan.  Complaint ¶73; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Simmons Aff. [Ex. 6]

¶¶18, 19.  When Ms. Trosdal heard that Plaintiff was unemployed, she offered to refer her to a

relative of hers who manages an area Hampton Inn.  Plaintiff thanked her for her offer.

However, when Ms. Trosdal spoke with the Agency about Plaintiff's Thrift Savings Plan, the

Agency informed Ms. Trosdal that Plaintiff had been fired from the Agency and, upon

information and belief, gave Ms. Trosdal such a poor reference that she did not refer Plaintiff to

her relative at the Hampton Inn for a position.  Simmons Aff. [Ex. 6] ¶¶20-23.

II.  <u>ARGUMENT</u>

A.  <u>Applicable Principles on Motions for Summary Judgment in Discrimination Cases</u>

The Court, of course, is familiar with the standards for considering motions for summary

judgment:

> Under Rule 56(c) of the [F.R.C.P.], summary judgment is to be granted only "if the
> pleadings, depositions, answers to interrogatories, and admissions on file together with
> the affidavits, if any, show that there is no genuine issue as to any material fact and that
> the moving party is entitled to judgment as a matter of law.  The district judge, in ruling
> on a summary judgment motion, must assume the truth of the nonmovant's evidence, and
> draw all justifiable inferences in that party's favor.

*Bayer v. United States Dep't of the Treasury*, 294 U.S. App. D.C. 44, 956 F.2d 330, 333 (1992),

*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  *Accord, Hunt v. Cromartie*,

526 U.S. 541, 549 (1999); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-555 (1990);

*Czekalski v. Peters*, 475 F.3d 360 (D.C. Cir. 2007).  As the Court is fully aware, "the judge's

function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  "'Summary

judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288 (D.C. Cir. 1998)

(en banc), quoting *Anderson*, 477 U.S. at 248.

A defendant moving for summary judgment must show "that there is an absence of

evidence to support [the plaintiff's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In considering summary judgment motions, "the court must draw all reasonable inferences in

favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000), *citing Anderson*, 477 U.S. at 255 (1986). "Therefore, the court 'must assume the truth of all statements proffered by the party opposing summary judgment' – except for wholly conclusory statements for which no supporting evidence is offered." *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 73 (D.D.C. 2002), citing *Greene v. Dalton*, 164 F.3d 671, 674-75 (D.C. Cir. 1999). *See also Reeves*, 530 U.S. at 150-51.

"This Circuit has held that because proof of discrimination may be difficult for a plaintiff to establish, 'the court should view summary judgment motions in such cases with special caution.' *Childers v. Slater*, 44 F. Supp. 2d 8, 15 (D.D.C. 1999) (*citing Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997)); *see Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993)." *Colbert v. Chao*, 2001 U.S. Dist. LEXIS 8266, at *16 (D.D.C. 2001), aff'd, 54 Fed. Appx 121 (D.C. Cir. 2002). In *Reeves*, the Court strongly cautioned trial judges in discrimination case to preserve the role of the jury with respect to the determination of credibility, the weighing of the evidence, and the drawing of legitimate inferences from the facts. The Court held:

> Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. [citation omitted] That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

530 U.S. at 151 (*citing* C.Wright & A. Miller, *Federal Practice and Procedure* § 2529, at 299-300 (2d ed. 1995)).

The proof scheme for proving discrimination by circumstantial evidence is well established. "First, the [complainant] has the burden of proving by the preponderance of the

evidence a *prima facie* case of discrimination." *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). The burden "is not onerous." Id. *See also Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002). "'[A] disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons.'" *Lyons*, 307 F.3d at 1112. "Once a plaintiff has established a prima facie case of discrimination, however modest it may appear, the burden shifts to the defendants to articulate some legitimate, nondiscriminatory reason for the challenged action." *Guerra v. U.S. Dep't of the Treasury*, 42 FEP Cases 1149, 1152 (D.D.C. 1987) (*citing Burdine*, 450 U.S. at 253). "The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. In general, the more idiosyncratic or questionable the employer's reasons, the easier it will be to expose it as a pretext, if indeed it is one." *Loeb v. Textron Inc.*, 600 F.2d 1003, 1014 n.6 (1st Cir. 1979). If the defendant meets this burden, the plaintiff may show that the proffered reason was pretextual, "either by showing that the asserted reasons were insufficient to explain the employer's decision or were not applied in a nondiscriminatory fashion, or by proving that a discriminatory reason more likely motivated the employer." *Burdine*, 450 U.S. at 256.

B. Plaintiff's Removal Was Discriminatory

Contrary to defendant (Mot. at 16), plaintiff has established a prima facie case of race and gender discrimination. She is an African-American woman; she was removed; and she has presented evidence showing that her work was at least good enough to avoid a performance improvement plan and removal and certainly that there is a genuine issue about this material fact. The record regarding her performance is explained below.

Ms. Simmons worked for the Agency for over sixteen years.  She earned steady

promotions from GS-4 to GS-9 by September 2000.  Until she worked for Herbert Scholl, she

received fully successful to outstanding performance evaluations.  She frequently received

performance awards including $500 awards in 1999 and 2000.  All of these facts are undisputed.

See pp. 1-3, above.

On her first performance appraisal as a Paralegal Specialist, GS-9, on June 22, 2001, Mr.

Scholl gave Plaintiff an overall rating of "pass" for the period of August 28, 2000, through April

30, 2001.  After consulting with Mr. Fien-Helfman and Mr. Landy, Mr. Scholl found Plaintiff's

work to be satisfactory.  Scholl Depo. [Deft. Ex. 3] 125-126.  Then, on August 26, 2001, the

Agency gave Plaintiff a within-grade step increase from GS-9/3 to GS-9/4.  Complaint ¶22;

Scholl Depo. [Deft. Ex. 3] 126-127, 129-130.  It is undisputed that as of August 2001, Mr. Scholl

felt that Plaintiff was performing an acceptable level.  Scholl Depo. [Deft. Ex. 3] 131.  Indeed,

she could not have received the within-grade unless her work was an acceptable level of

competence.  This is noteworthy since her office gave her little training in handling FOIA

requests, it has no manual or other document explaining uniform procedures for the paralegals,

and Plaintiff's supervisors kept giving her inconsistent instructions.  See pp. 5-6, above.

Plaintiff did well in her job, not only during her first performance period, but throughout

her last three years in the office.  Her supervisors praised her work, and her peers could tell that

she had a good understanding of her job and did it well.  See pp. 6-7, 10-11, above; Exs. 1, 2, 6,

7, 11 hereto; Deft. Exs. 7, 36.

Plaintiff's downfall began in February 2002, after she advised Mr. Scholl of an error he

had made.  See pp. 7-8, above.  Mr. Scholl then began scrutinizing Plaintiff's work

hypercritically and verbally abusing her sometimes in the presence of other employees in the

office.  Indeed, Mr. Scholl frequently yelled at her, cursed at her, belittled her, and humiliated
her.  See pp. 8-9, above.  When Mr. Scholl called her into his office on March 27, 2002, and
sharply denigrated her work, see p. 9 above, it was the first time since her promotion to GS-9
Paralegal Specialist, over one and one-half years earlier, that Mr. Scholl said that plaintiff was
not performing at her grade level.

In the course of protesting Mr. Scholl's harassment, she accused him of discrimination.
See pp. 13, 14, above.  For example, in March 2002 plaintiff told Mr. Scholl that if he did not
stop treating her badly, she was going to take him to court for treating her terribly.  Simmons
Depo. [Deft. Ex. 7] 93-94.  In addition, around this time, Plaintiff also informed Mr. Scholl that
his actions constituted "disparate treatment" and advised him that she would be fighting this
treatment in court.  See p. 13, above.  At some point, as Mr. Scholl acknowledges, Ms. Simmons
also accused Mr. Scholl of "discriminat[ing] against black female employees who had a college
education."  Scholl Depo. [Deft. Ex. 3] 147.  After Mr. Scholl gave her the first PIP, in October
2002, she again complained again to him about his disparate treatment of her.  See p. 13, above.
Then, when she opposed the proposal to remove her, she contended that Mr. Scholl's treatment
of her demonstrated a pattern of discriminatory and retaliatory conduct against her and that the
removal would constitute discrimination and retaliation.  Complaint ¶68; Pl. Int. Ans. [Ex. 1
hereto], No. 5.  These activities by Plaintiff were all protected.  *See Dickerson*, 238 F. Supp. 2d
at 286, *citing O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001) (holding that
informal complaints to superiors about discrimination constitute protected activity); *Goos v.
National Ass'n of Realtors*, 715 F. Supp. 2, 3 (D.D.C. 1989).

When the SEC targets someone to be fired, Ms. Nix relates, its managers do the
following: (1) find fault with the employee's work; (2) get several reviewers to agree that the

employee cannot do the work; (3) refuse the employee's transfer requests to another position within the agency; (3) give the employee poor references so that she cannot obtain a position outside the agency; and (4) eventually fire the employee.  Nix Affidavit [Ex. 7 hereto] ¶23.  Plaintiff sought to transfer to another office, such as the SEC District Office in Atlanta, but the Agency never transferred her.  See above, p. 19.  As Katie Nix explains, normally the Agency will not transfer a person whom management wants fired.  The SEC would not let Ms. Simmons transfer out of the office because if she went somewhere else and did well, it would reflect poorly on Mr. Scholl as a supervisor.  Nix Affidavit [Ex. 7 hereto] ¶23.  The way the SEC engineered Plaintiff's removal was consistent with this *modus operandi*.

　　　Mr. Scholl discriminated and retaliated against Plaintiff initially by giving her a Performance Appraisal for May 1, 2001 through April 30, 2002, with a "fail" rating on three critical elements and a "pass" rating on the other three critical elements.  She did not deserve those ratings, since her work performance did not decline.  See above, pp. 10-12.  Between July 2002 and October 1, 2002, Mr. Scholl did not give Plaintiff any further documents regarding her performance.  Then, on October 1, 2002, Mr. Scholl placed Ms. Simmons on a 90-day PIP.  It should be noted that Plaintiff's evaluations did not contain objective standards for the number of errors she would need to make to be considered Unsuccessful, Satisfactory, Good, or Exceptional on the subsidiary elements.  See, *e.g.*, Deft. Ex. 17.  This lack of precision permitted arbitrary treatment by her supervisors.  Thus, in one of Plaintiff's union arbitration hearings, Mr. Beller, the head of the Division, admitted that he did not know how many errors Plaintiff would have to make to be considered unacceptable.  See Deft. Ex. 8, p. 70.  Nor did Mr. Scholl's proposal to demote Plaintiff provide such guidance.  Id., pp. 71-72, 88.  It is settled that "subjectivity and reliability of employment procedures are relevant factors in a disparate

treatment case, and . . . subjective promotion procedures are to be closely scrutinized because of

their susceptibility to discriminatory abuse." *Bell v. Bolger*, 708 F.2d 1312, 1319-20 (8th Cir.

1983).  "[C]ourts traditionally treat explanations that rely heavily on subjective considerations

with caution," particularly because subjective factors "may mask discrimination." *Aka v.

Washington Hospital Cente*r, 156 F.3d at 1298, citing *Fischbach v. District of Columbia Dep't of

Corrections*, 318 U.S. App. D.C. 186, 86 F.3d 1180, 1184 (D.C. Cir. 1996);  *Bishopp v. District

of Columbia*, 788 F.2d 781, 787 (D.C. Cir. 1986) ("heightened scrutiny" must be applied when

an employer relies on subjective factors, rather than objective ones).  Under certain

circumstances, "'an employer's heavy use of highly subjective criteria, such as interpersonal

skills, could support an inference of discrimination.'"  *Gipson v. Wells Fargo, N.A.* Nos. 00-

2865, 05-1184, 2006 WL 3040647, *7 (D.D.C. Oct. 29, 2006) (quoting *Aka*, 156 F.3d at 1298)

(omission in original).

      Here Mr. Scholl's deposition testimony revealed how arbitrary he could be in evaluating

plaintiff when asked why he gave Ms. Simmons the 2002 PIP, Mr. Scholl gave a conclusory

response:  "The quality of her work was – was -- was below what was expected of her."  Scholl

Depo. [Deft. Ex. 3] 150.  Asked what he meant by that, he responded:  "Just that.  If you turn in

work that's supposed to be at a certain quality.  There should be – the responses should be

complete, there should be a complete package that's handed in.  That is, it should make sense,

your recommendations, it should be responsive to what's being asked for.  And it should be

following whatever guidelines are out there in preparing them."  Scholl Depo. [Deft. Ex. 3] 150-

151.  He added that the "PIP outlined some of her deficiencies" and gave examples of her work

product and errors he found and that he [thought] that there were concerns about her dealings

with staff member, the way she approached problems and resolved them."  Scholl Depo. [Deft. Ex. 3] 151.

Plaintiff's evidence shows that she performed well during the first PIP and afterwards and received kudos for doing so.  See p. 16 above.  Notwithstanding her demotion, plaintiff continued to perform her job well and professionally, and she did not deserve the second PIP.[11] Similarly, plaintiff did at least satisfactory work before and during her second PIP.[12]  See above. At the very least, her evidence shows that there are genuine issues about the facts about her performance during the relevant time period.

The record also shows that Mr. Scholl intended to use the PIP not as a correcting device, but as a step towards getting rid of plaintiff, for he told her that he put her on a PIP to prove that she was "incompetent as a paralegal specialist" and that he wanted to demote her after 90 days to a lesser position, such as secretary.  See p. 17 above.  Similarly, on December 4, 2002, even though she had been on the PIP for only 60 of its 90 days, Mr. Scholl called Plaintiff into his office and told her that he had no intention of giving her a "pass" rating on her PIP.  See p. 17 above.

In proposing Plaintiff's removal, Mr. Scholl cited 13 instances in which he claimed that she failed to satisfactory the standards of her position.  See Deft. Ex. 32; Deft. Ex. 36.  Besides the fact that Plaintiff's performance standards contained no objective means of measuring her performance on any of her elements, there was no merit to Mr. Scholl's contentions, as explained

---

[11]   Defendant contends that after it demoted her from a grade 9 to a grade 7 position, it assigned her less difficult work.  See Deft. Mot. at 7.  However, the record does not support that assertion. See Plaintiff's Affidavit [Ex. 6] ¶24.  Plaintiff was never told that her work as a grade 7 was less challenging.  Id.

[12]   Not only does plaintiff show that she met the criteria for a successful rating; she also proves that her managers, apparently desperate to find grounds or which to lower her rating,

in Plaintiff's affidavit in support of her opposition to the proposal to remove her, Deft. Ex. 36. In deciding to remove plaintiff, Mr. Beller agreed with only 9 of Mr. Scholl's 15 allegations, but, as explained in Plaintiff's Statement of Material Facts in Dispute, No. 3, the evidence thoroughly refutes Mr. Beller or at least presents a genuine issue for a jury to resolve.

Further, the fact that Ms. Lewis, Plaintiff's direct supervisor, found that Ms. Simmons had not made many errors and was performing adequately at her grade level, Lewis Depo. [Deft. Ex. 35] 20, 22, strongly contradicts the Agency's rationale for removing Plaintiff. It is also significant that Ms. Lewis found no fault in her work and indeed wrote her a letter of recommendation several months before the Agency removed plaintiff. Statements such as that clearly contradict an employer's assertion that the discharged employee was performing poorly. *See Runnebaum v. Nationsbank of Maryland, N.A.*, 95 F.3d 1285 (4th Cir. 1966), vacated on other grounds, 123 F.3d 156 (1997).

In addition, Katie Nix and Kay Reid, two of Plaintiff's colleagues, confirm that plaintiff's work was satisfactory and that Mr. Scholl unreasonably criticized her work. See *King v. Rumsfeld*, 328 F.3d 145, 149-50 (4th Cir. 2003) (explaining that co-workers' opinions might be relevant and admissible to set forth their employer's legitimate job performance expectations and to evaluate the employee's performance in light of those expectations); *Hibschman v. Regents of the Univ. of Maryland Sys.*, 208 F.3d 209 (4th Cir. 2000) (unpublished) (employees may be qualified for a particular position based on factors such as the testimony from others in the field that the employee was qualified).

Curiously in 2004, at the same time that Mr. Scholl gave Plaintiff her notice of proposed removal, Ms. Lewis became her supervisor. Ms. Lewis was supposed to review plaintiff's work,

manipulated the documents on her computer and apparently may even shredded documents. See

and she found Plaintiff's work to be satisfactory.  See Lewis Depo. [Ex. 10] 20, 22.  However,

Mr. Scholl admittedly reviewed all of Plaintiff's work anyway.  Evidence of irregularities by an

employer in following its own rules or procedures can support a finding of discrimination.  *See*

*Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 113-114 (3rd Cir. 1996); *Krodel*

*v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 817 (1985); *Rasimas v.*

*Michigan Dept. of Mental Health*, 714 F.2d 614, 623 (6th Cir. 1983); *Johnson v. Lehman*, 220

U.S. App. D.C. 100, 679 F.2d 918, 922 (1982).

There is also abundant evidence the Mr. Scholl engaged in race discrimination against

other African-Americans besides plaintiffs.  Thus, Mr. Scholl had a reputation in his office for

being a racist.  See Nix Affidavit [Ex. 7] ¶6.[13]  Some years before he supervised Plaintiff, two

supervisors mentioned that Mr. Scholl would never be a supervisor again because he was racially

prejudiced.  For many years after that he did not supervise anyone, although he was a Grade GS-

15 at the time.  Id.

The record shows that Mr. Scholl had a practice of discrimination against African-

American women in general.  He would not tolerate challenges by African-American women.

"Courts have become more willing to consider black women as an insular and discrete minority."

Alfred D. Matthewson, *A Symposium on Tort and Sport: Emphasizing Torts in Claims of*

*Discrimination Against Black Female Athletes*, 38 Washburn L.J. 817, 829 n. 7 (1999), *citing*

*Daniel v. Church's Chicken*, 942 F.Supp. 533 (S.D. Ala. 1996) (acknowledging black women as

a separate class).  This Court and other courts have adopted this principle.  *See Abraham v.*

*Graphic Arts Int'l Union*, 212 U.S. App. D.C. 412, 660 F.2d 811 (D.C. Cir. 1987); *Judge v.*

---

p. 12, above.

*Marsh*, 649 F.Supp. 770, 779-80 (D.D.C. 1986). *See also Barnes v. Costle*, 183 U.S. App. D.C. 90, 97, 561 F.2d 983, 990 (D.C. Cir. 1977). *Accord, Jeffries v. Harris County Comty Action Assoc.*, 615 F.2d 1025, 1034 (5th Cir. 1980). By contrast, Mr. Scholl had no difficulties accepting criticism from his Caucasian employees, both male and female, or his African-American <u>male</u> employees. Also, he admits that it was "unusual" for him to raise his voice at an employee. Scholl Depo. [Deft. Ex. 3] 230.

Mr. Scholl had no difficulty accepting criticism from his Caucasian employees, both male and female, or his African-American <u>male</u> employees, but he could not accept criticism from <u>African-American</u> <u>females</u>. Complaint ¶26; Pl. Int. Ans. [Ex. 1 hereto], No. 5; Simmons Aff. [Ex. 6] ¶¶4, 5; Reid Affidavit [Ex. 11] ¶17. For example, Brenda Nesbitt, another African-American female who worked under Mr. Scholl's supervision until the late 1990's, challenged Mr. Scholl and voiced criticism of him. Complaint ¶27. Mr. Scholl also criticized Ms. Nesbitt's work and her way of doing things. Like Plaintiff, he claimed that Ms. Nesbitt was unqualified, although she had trained him on FOIA requests in 1996, Mr. Scholl's criticism was clearly unwarranted. Besides training Mr. Scholl, Ms. Nesbitt trained a number of attorneys and financial analysts on FOIA; she also taught at orientations. Mr. Scholl yelled at Ms. Nesbitt and she eventually transferred her out of his department to avoid Mr. Scholl's verbal abuse. Reid Affidavit [Ex. 11] ¶17. She filed an EEO complaint against Mr. Scholl for alleged race discrimination and she resigned. Complaint ¶27.

Mr. Scholl discriminated against Irene Poyser, another African-American female who worked under his supervision. See Complaint ¶28. Ms. Poyser was a secretary with a paralegal

---

[13] Reputational evidence is admissible. *See*, *e.g.*, *E.E.O.C. v. Joe's Stone Crab, Inc*., 220 F.3d 1263 (11th Cir. 2000); *E.E.O.C. v. Sheet Metal Workers, Local 122*, 463 F.Supp. 388 (D. Md. 1978).

certificate.  Like Plaintiff, Ms. Poyser also challenged Mr. Scholl and voiced criticism of him.

See Complaint ¶28.  Ms. Poyser had many surgeries on her hands and needed speech

accommodation equipment so that she could speak, instead of type, her work.  She also needed a

quiet office to teach her accommodation software to recognize her words as she spoke.  Nix

Affidavit [Ex. 7 hereto] ¶31.  Her accommodation equipment was never set up right because her

cubicle was too noisy to teach her speech software properly.  Nix Affidavit [Ex. 12] ¶31.  She

was not permitted to move to a quieter area.  As with Plaintiff, Mr. Scholl remained her

supervisor when all other employees in her position were being switched to another supervisor.

Mr. Scholl refused to transfer her when she requested it, and he verbally abused her in front of

other employees on a regular basis.  Mr. Scholl yelled and cursed at Ms. Poyser.  Simmons Aff.

[Ex. 6] ¶4; Complaint ¶28.  He also made threatening remarks about her grade level.  Reid

Affidavit [Ex. 11] ¶17.  Ms. Poyser complained about this inequitable treatment to Alan Beller,

Director of the Division of Corporation Finance, but Mr. Beller rejected her complaint.  Ms.

Poyser developed serious health problems, but Mr. Scholl was insensitive to them.  Mr. Scholl

told Jamellia Person, his secretary, to tell Ms. Poyser to return to work the day after her last

surgery, but she could not do so.  See Nix Affidavit [Ex. 7] ¶31.  Mr. Scholl eventually

engineered her removal from the Agency.  Complaint ¶28.

Mr. Scholl also discriminated against Pearl Crawley (an African-American female with a

college degree), who was a Grade 12.  Reid Affidavit [Ex. 11] ¶17; Nix Affidavit [Ex. 7] ¶30.

Upon her request, the SEC transferred her to the Office of Rulemaking after Mr. Scholl said

threatening remarks about her grade level.  Reid Affidavit [Ex. 11] ¶17.  Ms. Crawley is

conscientious and thorough in her work and did her work well.  Nix Affidavit [Ex. 7] ¶30.

Although she deserved to be a Grade 12, Mr. Scholl told her that she was doing Grade 7 work.

Reid Affidavit [Ex. 11] ¶17.; Nix Affidavit [Ex. 12] ¶30. Ms. Crawley requested to be

transferred to, and was transferred to, another supervisor (who also was aware of the quality of

her work) and still works for the SEC.  Reid Affidavit [Ex. 11] ¶17.

By contrast, Mr. Scholl did not yell at Kay Reid or Cynthia Brooks, who were also

African-American paralegal specialists under Mr. Scholl's supervision.  Mr. Scholl also yelled at

white employees, such as Mr. Landy, but he never humiliated white employees or cursed at

them, and he yelled at the black employees much worse than he did the white employees.

Simmons Aff. [Ex. 6] ¶¶4, 5.

After the Agency removed Plaintiff, a Research Specialist position was posted within the

office.  Although Ms. Reid had enough college credits to be considered based on her seniority,

she was not selected for this position.  Mr. Scholl discriminated against her by hiring Ms.

Brooks, another Paralegal Specialist who had only a high school diploma.  Within one year, Mr.

Scholl promoted Ms. Brooks to a Grade 12.  However, Mr. Scholl required Ms. Reid, as a Grade

11, to train five new Research Specialists, some of whom were Grade 12s.  Ms. Reid is still a

Grade 11 Paralegal Specialist.  Reid Affidavit [Ex. 11] ¶18.

Also, after the Agency removed plaintiff, in February 2006 the NTEU filed a grievance

against Mr. Scholl, alleging that the impermissibly grouped employees by race in assigning

offices.  See Ex. 57 [SEC2507].  The courts have held that discriminatory conduct by the

employer after the alleged discrimination is probative of such discrimination.[14]  As stated by the

---

[14]   See *Freeman v. Madison Metropolitan School District*, 231 F.3d 374, 382-383 (7th Cir. 2000)
(error to exclude evidence of disparate treatment of a white comparator which occurred ten
months after last discriminatory act against plaintiff); *Ryder v. Westinghouse Electric Corp*., 128
F.2d 128, 133 (3rd Cir. 1997) (evidence of a discriminatory "corporate culture," including ageist
statements one year later, is admissible); *Townsend v. Metro Area Transit Auth*., 746 F.Supp.
178, 182 (D.D.C. 1990) (assigning some of selectee's duties to plaintiff after selection confirmed
plaintiff's qualifications).

Sixth Circuit, "Of course, proving that an employer refused to hire or promote because of a person's race or sex is difficult. . . . [I]t is incumbent on a sensitive decisionmaker to analyze all of the surrounding facts and circumstances to see if discriminatory intent can be reasonably inferred." *Grano v. Dep't of Development*, 637 F.2d 1073, 1081 n. 7 (6ᵗʰ Cir. 1980).

In sum, by removing Plaintiff, the Agency discriminated against her because of her race and gender.  In any event, plaintiff provides sufficient evidence on which a reasonable juror could determine that the Agency's rationale for removing her was pretextual, so that summary judgment is inappropriate in this case. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7ᵗʰ Cir. 2006):

> [A]s we have said countless times, the question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground. *E.g., Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).  If it is the true ground and not a pretext, the case is over.  If it is not the true ground, the employer may still be innocent of discrimination, *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 146-47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); he may for example have lied to conceal a reason that was discreditable but not discriminatory.  *See Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 657 (7th Cir. 1991) (en banc).  But the case could not be resolved on summary judgment, because a trier of fact (judge or jury) would be entitled to infer a discriminatory motive from the pretextual character of the employer's ground. *Reeves v. Sanderson Plumbing Products, Inc.*, *supra*, 530 U.S. at 147-48, 120 S.Ct. 2097; *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002).

Defendant argues that plaintiff has not made out a prima facie case because it did not replace plaintiff with persons outside the protected classes (African-Americans and women). See Deft. Mot. at 15 *et seq.*  However, it is settled that, to establish a discrimination complaint, the complainant need not compare himself with persons who are identically situated; it is sufficient if the "comparators" are substantially similar to the complainant. *See McDonnell-Douglas Corp. v. Green*¸ 411 U.S. 792, 803 (1973) (plaintiff's work-rule violations should be compared with those of 'comparable seriousness'); *George v. Leavitt*, 407 F.3d 405, 412 (D.C.

Cir. 2005); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (held

that the district court applied too narrow a standard in deciding that the other employees were not

comparable because they performed job functions different from the plaintiff). The court of

appeals in *George* stated:

> We note in passing that, in assessing whether George made out a prima facie case,
> the District Court committed two legal errors. First, the District Court held that, "[t]o
> establish a prima facie case of disparate treatment discrimination, the plaintiff must show
> [*inter alia*] that she was treated differently than [sic] similarly situated employees."
> *George*, slip op. at 7, J.A. 576. This is not a correct statement of the law. We have made
> clear that a plaintiff makes out a prima facie case of disparate-treatment discrimination
> "by establishing that: '(1) she is a member of a protected class; (2) she suffered an
> adverse employment action; and (3) the unfavorable action gives rise to an inference of
> discrimination.'" *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v.
> Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). One method by which a plaintiff can satisfy
> the third prong of this test is by demonstrating that she was treated differently from
> similarly situated employees who are not part of the protected class. *See Holbrook v.
> Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). But this is not the only way. . .

> In *Stella* and *Teneyck*, we made clear that another way to satisfy *Stella*'s third prong is to
> show that the adverse employment action "is not attributable to 'the two most common
> legitimate reasons on which an employer might rely to reject a job applicant: an absolute
> or relative lack of qualifications or the absence of a vacancy in the job sought.'" *Stella*,
> 284 F.3d at 145 (quoting *Teamsters*, 431 U.S. at 358 n.44); *see also Teneyck*, 365 F.3d at
> 1150-51. "Elimination of these reasons . . . is sufficient, absent other explanation, to
> create an inference that the decision was a discriminatory one." *Teamsters*, 431 U.S. at
> 358 n.44. In the context of a discharge claim, this method of establishing the prima facie
> case would require a showing that the discharge was not attributable to the two analogous
> common legitimate reasons for discharge: performance below the employer's legitimate
> expectations or the elimination of the plaintiff's position altogether. *See* 1 LEX K.
> LARSON, EMPLOYMENT DISCRIMINATION § 8.08[4] (2d ed. 2005).

### C. Retaliation for Opposing Discrimination

In addition, in removing plaintiff Defendant retaliated against her in violation of Title

VII, 42 U.S.C. §2000e-3(a). As described above, in opposing alleged discrimination by the

Agency, Plaintiff engaged in activities protected by Title VII, 42 U.S.C. §2000e-3(a). Thus,

before her removal, she frequently objected to Mr. Scholl's discriminatory treatment of her. See

pp. 10, 14, 27, above. To make out a claim for retaliation, the plaintiff need only prove she had a

reasonable good faith belief that the practice she opposed was unlawful under Title VII, not that it actually violated the Act.  *See Goos*, 715 F. Supp. at 3; *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2nd Cir. 1988).  Defendant (notably Mr. Scholl) admittedly knew of these activities when Plaintiff engaged in them. See above. [15]   Defendant asserts that Mr. Scholl did not know about EEO complaint until 2005 (Mot. at 13), but plaintiff's reprisal claims are based on her informal protected activities, which began in 2002.

Further, there is evidence of causation.   Particularly in 2002, after plaintiff charged him with race discrimination, Mr. Scholl's retaliatory actions quickly followed her protected activities.  Thus, after she first threatened to take him to court, he began nitpicking her work and gave her a bad evaluation; he gave her the first PIP in October 2002 after she strongly defended her work during the prior rating period complained of race discrimination; and he proposed her demotion three months after she objected that Mr. Scholl discriminated against her by giving her that the PIP.  It is settled that the plaintiff may demonstrate a causal connection exists with proof of both defendant's knowledge of her protected activity and temporal proximity between the protected activity and retaliation.  *See Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006); causation may be construed from "close temporal proximity" between the protected action and the act of discrimination (or alleged retaliation); *Childs-Pierce v. Utility Worker's Union of America*, 383 F. Supp. 2d 60, 76 (D.D.C. 2005); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 84 (D.D.C. 2003).

Mr. Scholl retaliated not only by giving plaintiff the PIPs, unacceptable performance ratings, and the proposal to remove her.  He also gave her horrible references when she tried to

---

[15]   Mr. Scholl testified that he did not recall Ms. Simmons' reaction to him placing her on a PIP, nor whether Ms. Simmons accused him of discrimination at that point.  Scholl Depo. [Deft. Ex. 3] 154.

get out of his office.  As explained above, he gave made damaging statements about her to the

D.C. Superior Court, Home Depot, and other places to which she was under active consideration

for other employment.  See Pl. Statement of Material Facts, No. 6. The law prohibits such

references as retaliation.  See *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345-46 (1997).

For the foregoing reasons, plaintiff has established her reprisal claims.

### III.  <u>CONCLUSION</u>

For the reasons stated above, plaintiff respectfully requests that the Court deny

defendant's motion for summary judgment and schedule the case for mediation and, if the case

does not settle, for a pretrial conference.

Respectfully submitted,


___/s/ Alan Banov_____
ALAN BANOV #95059
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036
(202) 822-9699
Fax: (202) 842-9331
ab@banovlaw.com
<u>Attorney for Plaintiff</u>